THE DIXIE, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 61622. Filed November 19, 1958.

*William A. Moore, Esq.*, for the petitioner.
*John F. Walsh, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined a deficiency in petitioner's income tax for the taxable year 1952 in the amount of $22,053.11. The

sole issue for decision is whether petitioner is subject to the surtax imposed by section 102 of the Internal Revenue Code of 1939 with respect to corporations improperly accumulating surplus.

FINDINGS OF FACT.

Some of the facts are stipulated and are hereby found as stipulated.

Petitioner, The Dixie, Inc. (hereinafter referred to as Dixie), is a corporation which was organized under the laws of the State of New York on March 23, 1942, and at all times pertinent hereto has been engaged in the business of operating the premises at 241 West 42d Street, New York City, known as the Hotel Dixie. It filed its income tax return for the calendar year 1952 on an accrual basis with the district director of internal revenue for the Upper Manhattan district of New York. Petitioner reported a normal tax and surtax net income in the amount of $155,610.71, and an income tax liability for the year 1952 in the amount of $75,417.57. After payment of the above tax, the balance of its net income, $80,193.14, was retained by the corporation.

King Hotels, Incorporated (hereinafter referred to as King), was organized under the laws of the State of New York on March 13, 1942. All of its capital stock was originally acquired by and has been continuously owned by Hyman B. Cantor and Gertrude L. Cantor, his wife. Shortly after its organization, King acquired by purchase the premises known as the Hotel Dixie, located at 241 West 42d Street, New York City, from the Bowery Savings Bank for a consideration of $1,200,000, of which $1,125,000 was a mortgage. Since that time, King has continued to own the above premises.

Carter Hotels Operating Corporation (hereinafter referred to as Carter) was organized under the laws of the State of New York in or about August 1941. All of its capital stock was originally acquired by and has been continuously owned by Hyman B. Cantor and Gertrude L. Cantor, his wife. Its principal business is that of renting and managing agent of the Hotels Dixie, Essex, Avery, and George Washington, all of which hotels are owned and operated by a Cantor-owned corporation.

All of the capital stock of Dixie was acquired upon its organization by Hyman B. Cantor for $1,000 cash, and has continued since to be owned by him. On April 16, 1942, petitioner entered into an agreement of lease of the premises located at 241 West 42d Street, New York City, with King for a period of 5 years. Since then, this agreement has been extended by agreement dated January 21, 1947, to April 30, 1952, by agreement dated April 15, 1952, to April 30, 1957, and by agreement dated November 15, 1955, to April 30, 1962. The rentals payable to King under the lease were a minimum of $10,000

per month, plus an additional rental of 15 per cent of annual gross income in excess of $800,000. Petitioner paid the following rentals to King for the period 1948 to 1957:

| | | | |
|---|---|---|---|
| 1948 | $249, 489. 41 | 1953 | $249, 051. 15 |
| 1949 | 228, 840. 72 | 1954 | 242, 207. 19 |
| 1950 | 242, 777. 73 | 1955 | 252, 338. 31 |
| 1951 | 230, 566. 91 | 1956 | 294, 871. 39 |
| 1952 | 239, 702. 62 | 1957 | 309, 302. 98 |

The premises at 241 West 42d Street, at and above street level, constitute a hotel of 620 rooms. The premises below the street level were originally designed and constructed for use as a bus terminal and were leased as a bus terminal to the Dixie Bus Depot, Inc., by written lease. Pertinent provisions of the lease are as follows:

WHEREAS the Lessor in compliance with the request of The Lessee has agreed to renew and extend the said lease dated July 15, 1932, and the memorandum of lease dated February 23, 1934, as renewed and extended by said agreement dated May 21, 1935, for a further period of ten (10) years from June 30, 1947, upon the same rents, covenants, agreements, terms and conditions contained therein, except as to such extent as the same are modified by the provisions of this agreement, provided The Lessee be not in default thereunder on June 30, 1947, and further provided that the said lease dated July 15, 1932, and the said memorandum of lease dated February 23, 1934, as extended and renewed hereby shall be subject and subordinate to any mortgage or mortgages that may have been placed on the said premises prior to June 30, 1947, or which may thereafter be placed on the said premises, and

WHEREAS the parties hereto are aware of the possibility of the enactment of a statute or ordinance having the effect of prohibiting the use of the demised premises for a bus terminal prior to the end of the extended period provided for herein and, thereby, terminating said leases as extended and modified hereby prior to June 30, 1957, and making necessary extensive alterations to said premises at a cost which is not possible to estimate at the present time, all at a time when said premises may not be readily rented for other purposes, and

WHEREAS the parties hereto are agreed that a termination of said lease as extended hereby, prior to June 30, 1957, as contemplated in the last preceding paragraph hereof would work a hardship upon The Lessor for which The Lessor is entitled to compensation in consideration of its granting the extension provided for herein notwithstanding the aforesaid possibility of the termination of said leases by operation of law before the end of the extended period,

\*        \*        \*        \*        \*        \*        \*

3. The Lessee covenants and agrees to pay to The Lessor and The Lessor agrees to accept as rent for that part of the demised premises outlined inblue [sic] on the diagram annexed to the said lease dated July 15, 1932, as "Exhibit A," during the period of the extension of said lease dated July 15, 1932, as previously extended, as herein provided, that is, from July 1, 1947 to June 30, 1957, an annual rental during said term of a sum equal to five per cent (5%) of the total amount of the gross annual receipts of The Lessee, as hereinafter defined, payable monthly on the basis of the statements to be furnished The Lessor as provided in paragraph 12 of said lease dated July 15, 1932, on the tenth day of every month during the term hereof, beginning on the 10th day of August, 1947; provided, however, that the rental payable hereunder shall in no event be less

than the sum of Forty-five thousand Dollars ($45,000.00) per annum, payable in equal monthly instalments on the tenth day of each and every month. The rent payable shall be adjusted each month on the basis (1) of five per cent (5%) of the gross receipts of the Lessee accumulated to end of the preceding month from the beginning of the fiscal year or (2) of the minimum rent payable during such period, whichever is greater. The first fiscal period shall begin on July 1, 1947 and end on June 30, 1948. Thereafter each fiscal year shall begin July 1st and end on the following June 30th. The rent provided for hereunder shall accrue from the first day of July, 1947. It is understood that the gross *receipts* of The Lessee shall mean receipts from every source in connection with the demised premises and including all amounts, other than taxes, collected from passengers for tickets sold at the demised premises and at all other ticket agencies or other places for the sale of bus transportation tickets located on either side of the four streets surrounding the block on which the demised premises are located, that is to say, on the north and south sides of 42nd Street and 43rd Street between the easterly side of Seventh Avenue and the westerly side of Eighth Avenue and on the east and west sides of Seventh Avenue and Eighth Avenue between the southerly side of 42nd Street and the Northerly side of 43rd Street, maintained by The Lessee, its agents, servants, employees, affiliates and/or by any person, firm or corporation in which The Lessee has an interest or owns capital stock, or by any firm or corporation, or agent of such firm or corporation who is or shall become a user of the demised premises under the lease.

\*        \*        \*        \*        \*        \*        \*

7. In the event that the said lease of July 15, 1932, as herein further extended, is terminated prior to June 30, 1957, by reason of the enactment of any valid statute or ordinance having the effect of prohibiting the use of the demised premises for a bus terminal then and in that event The Lessee agrees to pay to the Lessor the sum of Twenty-five thousand Dollars ($25,000.00), if such termination occurs on or before June 30, 1949, or the sum of Twenty thousand Dollars ($20,000.00), if such termination occurs after June 30, 1949, and on or before June 30, 1951, or the sum of Fifteen thousand Dollars ($15,000.00), if such termination occurs after June 30, 1951, and on or before June 30, 1953, or the sum of Ten thousand Dollars ($10,000.00) if such termination occurs after June 30, 1953, and on or before June 30, 1955, or the sum of Five thousand Dollars ($5,000.00) if such termination occurs after June 30, 1955, and on or before January 1, 1957, and if thereafter, without payment of other than the current obligations. In the event of the enactment of a valid statute or ordinance prohibiting any alteration to said bus terminal without which alteration any of the buses of the users of the terminal cannot enter and depart therefrom and by reason thereof the number of buses departing therefrom daily is reduced to fifty percent, or less, of the daily average number of buses having departed therefrom during the six months period from January 1, 1947 to June 30, 1947, the Lessee may, at its option, terminate the said leases, as hereby *extended* upon the payment to the Lessor of the sum of Twenty-five thousand Dollars ($25,000.00) if such termination occurs on or before June 30, 1949, or the sum of Twenty thousand Dollars ($20,000.00) if such termination occurs after June 30, 1949, and on or before June 30, 1951, or the sum of Fifteen thousand Dollars ($15,000.00) if such termination occurs after June 30, 1951, and on or before June 30, 1953, or the sum of Ten thousand Dollars ($10,000.00) if such termination occurs after June 30, 1953, and on or before June 30, 1955, or the sum of Five thousand Dollars ($5,000.00) if such termination occurs after June 30, 1955, and on or before January 1, 1957, and if thereafter, without payment of other than the current obligations. \* \* \*

The rent paid to petitioner under this lease for the years 1948 to 1957 was:

| | | | |
|---|---|---|---|
| 1948 | $110,508.92 | 1953 | $53,892.42 |
| 1949 | 116,242.91 | 1954 | 49,872.53 |
| 1950 | 109,420.85 | 1955 | 50,086.07 |
| 1951 | 59,092.10 | 1956 | 49,600.23 |
| 1952 | 53,561.81 | 1957 | 15,900.77 |

In 1950 the New York Port Authority Bus Depot at Eighth Avenue opened its facilities to bus-chartering companies, which resulted in the declining use of the Dixie Bus Depot by the chartering bus companies and an increasing likelihood that the Dixie Bus Depot, Inc., would not renew its lease in 1957.

On March 23, 1942, petitioner entered into an agreement with Carter wherein Carter was appointed sole and exclusive renting and managing agent of Hotel Dixie for a period of 5 years. This agreement was extended by further agreement dated January 21, 1947, to December 31, 1952, and by agreement dated December 15, 1952, to December 31, 1957. The management and rental fees payable to Carter under the agreement were to be 3 per cent of the annual gross income of the hotel up to $300,000, plus 4 per cent of the annual gross income of the hotel in excess of $300,000 and up to $400,000, plus 5 per cent of the annual gross income in excess of $400,000. By agreement dated September 1, 1955, the fees payable under the contract were increased to 4 per cent on the first $300,000 of the annual gross income of the hotel, 5 per cent on the next $100,000 of the annual gross income of the hotel, and 6 per cent of the annual gross income of the hotel over $400,000.

At approximately the same time that the Hotel Dixie was acquired from the Bowery Savings Bank, Hyman B. Cantor became interested in the Hotel Lincoln. The Hotel Lincoln, presently known as the Manhattan Hotel, is located in the Times Square area, on Eighth Avenue between West 44th Street and West 45th Street, and contains approximately 1,400 rooms. Cantor contacted Max Kramer, the then owner of the Hotel Lincoln, and discussed with him the possibility of Cantor acquiring the Lincoln. Kramer was unwilling to sell.

In 1946 Max Kramer died and his widow, Maria Kramer (hereinafter referred to as Maria), became the owner of the Hotel Lincoln. Cantor sought to purchase the Hotel Lincoln from Maria. Prior to 1952, he made several telephone calls to Maria and approached her at various times concerning the purchase of the hotel. However, on those occasions, no specific arrangement was ever discussed by him with her. Maria was not then willing to sell the Hotel Lincoln. Subsequent to Max Kramer's death, the Hotel Lincoln was allowed to deteriorate to the point that it no longer was a serious competitor

to Hotel Dixie or the other hotels in the Times Square area. Cantor made a personal inspection of the Hotel Lincoln in 1952 and saw its condition, but continued his efforts to acquire the hotel.

In 1952 petitioner's tax returns for the year 1950 were investigated by one of respondent's agents and discussions were had by him with the officers of Dixie relating to the large accumulation of surplus.

On July 29, 1952, the vice president of Dixie, Allan Seserman, sent a letter to respondent's agent in which he explained the reasons for the accumulation of surplus in 1950 as follows:

The lease on the Bus Terminal in the Dixie, Inc. expires on June 30, 1957. This Lease provides for a Minimum Basic Rental plus Commissions. The greatest earnings, however, come from the Commissions. In 1948, for example, we had received a rental of $109,908.92. In 1949, this increased to $115,642.91. In 1950, it had reduced to $108,820.85. However, with the advent of the Port Authority Terminal, our Tenant at the Dixie lost several of his lines which reduced the income in 1951 to $58,492.10. The Prospect of further reductions is imminent and it is problematical and highly speculative whether or not the Bus Terminal will be able to remain and fulfill its lease. Should such a contingency occur, since the Bus Terminal occupies our entire basement space, it would be necessary for us to rehabilitate the entire basement and move all our departments now located on the second floor to the basement, making it further necessary for us to rehabilitate, rebuild and recondition the rooms on the second floor for use of Guests. Such a program would entail an expenditure of over $250,000.

Furthermore, in the light of the modern trend of competition, the Board of Directors of the Dixie, Inc. have had under advisement the question of meeting the television problem which would require an additional expenditure of approximately $300. per room, for installation, equipment and service. This program would cost an additional $210,000.

During all of the years pertinent hereto, Hyman B. Cantor and Gertrude L. Cantor, his wife, owned all of the stock of or controlled the following corporations:

King Hotels, Inc., which owned the Hotel Dixie.

Carter Hotels Operating Corporation, which acted as manager and rental agent for the Hotels Essex, Avery, George Washington, and Dixie.

New Haven Hotel Company, which owned the Hotel Garde.

Hotel George Washington, Inc., which leased the Hotel George Washington.

Essex, Inc., which operated the Hotel Essex.

Carter Hotels, Inc., which owned the Hotel Essex.

Hotel Essex, Boston, Corporation, which owned the Hotel Essex, Boston.

Avery, Inc., which operated the Hotel Avery.

Hotel Avery Corporation, which owned the Hotel Avery.

Hotel Governor Clinton Co., Inc.

Cantor had sold the Hotel Riviera, Inc., Newark, New Jersey, prior to 1952. At all times pertinent hereto, except as hereafter noted, the officers of the petitioner, Carter, and King were:

President and treasurer—Hyman B. Cantor.
Vice president and secretary—Allan Seserman.
Assistant secretary—Gertrude L. Cantor.

Samuel Shufro held the position of vice president and secretary from March 26, 1942, to July 13, 1950, and that office has been held by Albert E. Baker from February 25, 1955, to date.

At all times pertinent hereto, the directors of petitioner, Carter, and King were the same three individuals as the officers of those corporations. Except during the summer, the directors met monthly, at which time the affairs of all corporations were acted upon and the general problems of the Cantor investments were discussed by those who attended. In addition to the members of the board of directors, these meetings were attended by Ralph E. Reynolds, a representative of the firm Choate, Reynolds & Hollister, general counsels, and personal advisor and counsel to Cantor since 1942. The meetings were also attended by a member of Harris, Kerr, Forster & Company, hotel auditors and consultants prominent in the hotel field. In 1952 the member of the firm who usually attended the meetings was either Thomas Hogan or Murray Rappaport. Rappaport has been a member of Harris, Kerr, Forster & Company for 40 years and is an advisor and consultant rather than in charge of accounting matters. He attended more meetings of the corporations than did Hogan in 1952.

At these meetings a regular monthly report on the operation of each corporation was submitted by the representative of Harris, Kerr, Forster & Company. The monthly report was in the form of an accounting analysis of the corporation's business. However, no minutes of the directors' meetings were ever taken, nor were written reports of the meetings ever prepared subsequent to their adjournment.

At the directors' meetings during 1952, among the problems which were discussed relative to Dixie were the anticipated loss of a tenant for the bus terminal in 1957, and the installation of air conditioning and television.

Two alternative plans were advanced at the directors' meetings with respect to the bus terminal. One plan involved remodeling the basement for suitable use by another tenant. However, no estimate was made of the cost which such remodeling might entail. The second plan was that the hotel be remodeled at the first level and converted into rooms available for guests, and that the basement be converted into space into which the offices of the Dixie, King, and Carter could then be moved. However, the extent of the planning to this end in the year 1952 was extremely limited. No outside consultant or contractor was called into the meetings or requested to investigate the problems and make estimates of the expected costs which any of these plans might involve. The hotel engineer did make a casual survey of the basement and estimated what he thought would be the cost of remodeling, based on total conversion of the basement to uses other than

as a bus terminal and on the supposition that the columns supporting the entire building would be taken down or at least partially removed. He estimated the cost of such remodeling to be $500,000 in 1952. If the supporting columns were left undisturbed, the cost of reconstructing walls and office rooms would be much less than the plan for total removal would entail. However, no estimate of such cost was attempted by the petitioner or any agent of the petitioner.

There existed two immediate needs for the Hotel Dixie which were discussed by the board during the years pertinent hereto, including 1952. These concerned the need for air-conditioning the entire hotel resulting from the action of other hotels in the Times Square area which were air-conditioning their rooms or had already done so, and the installation of television in each guest room. It was estimated, again solely by petitioner's officers and hotel engineer without the benefit of outside consultation or expert analysis, that televising each room of the hotel would require a total expenditure of $120,000 to $150,000 and that air conditioning would require a total of $300,000 to $350,000. The directors also discussed the accumulated earnings of Dixie and the fact that a revenue agent had indicated a possible tax upon the accumulation.

During the years pertinent hereto, the average percentage occupancy of the Hotel Dixie was higher than that of most of the other major competing hotels in the Times Square area and was above the national average. However, the directors realized that if the Hotel Lincoln were renovated to any appreciable degree, it would increase the competition, to some extent at least, in the Times Square area. During the year 1952, those attending the board of directors meetings discussed the possible purchase of the Hotel Lincoln by Cantor, although no definite plan was discussed at these meetings as to whether the Lincoln would be purchased by any one particular corporation then owned by Cantor, or whether a new corporation would be formed to acquire it. No specific arrangement was authorized nor was any resolution ever adopted authorizing the conduct of negotiations for the purchase of the Lincoln. Actually, it was customary for Cantor, acting in his personal capacity, to make all arrangements for acquisition of a new hotel and have the details of the transaction settled before deciding which corporation would acquire the new business.

It was expected that a new owner of the Hotel Lincoln would remodel the hotel, at least to some extent, which in turn would require a remodeling of the Hotel Dixie to maintain its competitive position. Just what the expected cost of remodeling would be was not known and depended mostly on the extent to which the Hotel Lincoln was remodeled. No estimate was made in 1952 of any expected expenses for

remodeling, nor was any survey made as to the immediate needs of the Hotel Dixie in this connection.

The additions to petitioner's fixed assets account since December 31, 1949, are as follows:

| Additions to hotel | Leasehold improvements | Furniture and equipment | Air conditioning | Television | Renovation |
|---|---|---|---|---|---|
| 1950 | | $18,993.98 | | | |
| 1951 | $40,028.98 | 4,884.78 | | | |
| *1952* | 13,432.30 | 1,120.43 | | | |
| Neon signs | 21,123.91 | | | | |
| 1953 | 1,580.00 | 9,286.83 | | | |
| 1954 | | 971.25 | $28,000.00 | | |
| *1955* | 7,204.48 | | | | |
| Ice boxes | | 15,125.55 | | | |
| Marquee installation | 11,659.60 | | | | |
| T. V. antenna | | | | $27,850.00 | |
| Lobby-survey | | | | | $1,000.00 |
| *1956* | | | | | |
| Air-conditioning, wiring, etc | | | 53,571.75 | | |
| Door replacement | | | | | 6,595.00 |
| Air-conditioning units | | | 45,334.49 | | |
| Television receivers | | | | 93,143.91 | |
| Piano and automobile | | 3,945.41 | | | |
| *1957* | | | | | |
| Lobby improvements | | | | | 61,354.45 |
| Air-conditioning units | | | 32,511.28 | | |
| Electric signs | 10,300.00 | | | | |
| Television receivers | | | | 853.62 | |
| Ice machine and typewriter | | 2,219.30 | | | |
| Total | 105,329.27 | 56,547.53 | 159,417.52 | 121,847.53 | 68,949.45 |
| Total since 1952 | 65,300.29 | 32,668.77 | 159,417.52 | 121,847.53 | 68,949.45 |

The petitioner's quick assets, quick liabilities, and the excess of its quick assets over quick liabilities, for the period December 31, 1948 through 1957, were as follows:

| Year | Quick assets | | Quick liabilities | Excess |
|---|---|---|---|---|
| | Cash | U. S. bonds | | |
| 1948 | $17,390.98 | $500,000.00 | $308,625.68 | $208,765.30 |
| 1949 | 80,238.51 | [1] 400,000.00 | [2] 257,481.62 | [1] 222,756.89 |
| 1950 | 56,795.60 | 623,943.75 | 354,658.20 | 426,071.15 |
| 1951 | 47,772.22 | 623,943.75 | 253,408.97 | 418,307.00 |
| 1952 | 63,570.50 | 744,990.62 | 242,474.69 | 566,086.43 |
| 1953 | 74,832.89 | 744,990.62 | 195,264.54 | 624,558.97 |
| 1954 | 25,197.65 | 744,990.62 | 205,550.06 | 564,638.21 |
| 1955 | 32,368.01 | 670,037.50 | 194,546.26 | 507,859.25 |
| 1956 | 369,491.53 | 367,506.25 | 244,366.04 | 492,631.72 |
| 1957 | 222,560.31 | 367,506.25 | 128,438.53 | 461,527.03 |

[1] This includes $250,000 U. S. bonds which, with other bonds ($799,850), were pledged with the Marine Midland Trust Co. of New York as collateral on petitioner's note for $800,000.
[2] In addition to note referred to.

The petitioner's net income, reported for tax purposes, for each of the years 1942 through 1957; and the Federal income and excess profits

taxes reported on said income; and the accumulated earnings and profits, per its books, at the close of the years, were as follows:

| Year | Income | Income and excess profits tax | Accumulated earnings and profits |
|---|---|---|---|
| 1942 | $32,588.45 | $25,670.76 | $32,588.45 |
| 1943 | 151,588.79 | 123,849.89 | 160,385.34 |
| 1944 | 148,468.28 | 94,332.27 | 199,787.86 |
| 1945 | 105,056.56 | 52,432.94 | 197,693.58 |
| 1946 | 53,349.77 | 20,272.91 | 155,260.74 |
| 1947 | 190,369.10 | 72,340.25 | 263,856.46 |
| 1948 | 163,512.22 | 62,134.64 | 380,494.87 |
| 1949 | 112,484.56 | 42,744.13 | 450,286.30 |
| 1950 | ¹162,152.68 | 52,108.63 | 566,495.12 |
| 1951 | 65,485.52 | 27,733.90 | 629,668.99 |
| 1952 | 151,276.22 | 73,168.63 | 708,660.81 |
| 1953 | 131,687.28 | 62,977.39 | 791,327.02 |
| 1954 | 86,947.50 | 39,712.70 | 838,561.82 |
| 1955 | 21,702.90 | 6,559.62 | 858,485.60 |
| 1956 | 129,931.14 | 72,328.34 | ---------- |
| 1957 | 5,329.94 | 1,598.98 | ---------- |

¹ Includes $66,150 gain on sale of bonds.

Since its inception, in 1942, petitioner has never paid any dividends. If the earnings and profits of petitioner for 1952 had been distributed to its sole stockholder, Hyman B. Cantor, during that year, the additional surtax liability of Cantor would have been $60,903.22.

Subsequent to 1952, Cantor continued his efforts to purchase the Hotel Lincoln from Maria. He had several telephone conversations but no other contact with her until December 24, 1954, at which time Ralph E. Reynolds, on behalf of Cantor, went to Maria's suite at the Hotel Lincoln, where she was then living, and made an offer of some $4,000,000. At the time of that offer, it was known by Cantor and Reynolds that Maria was asking some $7,000,000 for the hotel. The offer of $4,000,000 was refused. Cantor made other offers to Maria, which entailed the payment of a stated yearly amount for her life and a smaller downpayment. None of these offers were acceptable to Maria. The Hotel Lincoln was purchased in May 1956 from Maria by Webb & Knapp. Subsequent to the purchase, the hotel was renovated to a large extent, refurnished, completely televised, and air-conditioned, and reopened for business about October 1, 1957, under the name of the Manhattan Hotel.

On October 4, 1955, the respondent notified petitioner that a deficiency was to be proposed pursuant to section 102 with respect to the accumulation of $80,193.14 in the year 1952, and provided petitioner with time to file the statement provided by section 534 of the 1954 Code. On October 31, 1955, petitioner submitted a statement to the respondent, as provided by section 534 of the 1954 Code, in which it

stated grounds, and facts on which those grounds were based, for the accumulation of surplus.[1]

On January 17, 1956, respondent notified petitioner of a determination of a deficiency in income taxes for the year 1952 pursuant to section 102 of the 1939 Code.

During the year 1952, petitioner was availed of for the purpose of avoiding surtax upon its shareholders.

OPINION.

Petitioner asserts that the accumulation of $80,193.14 in the year 1952 was for the reasonable needs of its business and that petitioner corporation was not availed of for the purpose of avoiding the imposition of surtax upon its shareholders. We have found otherwise as a fact.

---

[1] The letter reads in part:

I.

One block north of the taxpayer's hotel there is a much larger hotel, the Lincoln, which caters to a clientele that is similar to that of the Dixie. This hotel has approximately 1,400 rooms as compared to the taxpayer's 620. It has been allowed to deteriorate over a number of years so that at present its occupancy rate is less than 20% and its operation is most inefficient. As a result, its competition has not been strongly felt.

This hotel is for sale and the taxpayer had been since prior to 1952 attempting to purchase it. Within recent months negotiations had progressed to the point where taxpayer's President personally met with the owner of the Lincoln at a conference at which the attorney for The Dixie, Inc. and the accountant for the Hotel Lincoln were present. The purchase if consummated would require a cash outlay of more than $3,000,000.00, and would further require very substantial expenditures for rehabilitation.

The acquisition of this hotel by an aggressive competing operator would have drastic adverse effects on the operation of the taxpayer's hotel. Unless the taxpayer took extreme steps to meet this competition, its own rate of occupancy would speedily be reduced far below the level of profitability. The taxpayer would have to embark on a large scale promotional and advertising campaign, increase its sales staff and refurnish and modernize the entire hotel and all its facilities in order to stay in business.

The taxpayer, for many years has been and still is squarely on the horns of an economic dilemma, which will continue and cannot be resolved as long as the Hotel Lincoln remains under its present management. It must be prepared at any time to meet any reasonable outside offer for the purchase of the Hotel Lincoln, or to embark on an expensive campaign of improvement and promotion. Failure to adopt either of these alternatives could reasonably be expected to injure the taxpayer's business to a disastrous extent. The adoption of either of them would require the outlay of extremely large funds. The taxpayer has no way of knowing which alternative it will be required to adopt but is certain that it will be compelled, by the economics involved, to make its choice within the near future.

It is, therefore, more than a matter of "reasonable anticipation" to say that the taxpayer must retain its surplus for one or the other of these contingencies; it is a matter of dire necessity that this should be done, lest the taxpayer face economic extinction.

II.

The Hotel Dixie is an old building and badly in need of modernization and refurnishing. Improvements which are required include the installation of air-conditioning throughout the building, the installation of television receivers, refurnishing with new furniture, carpets, drapes, etc., redecorating both inside and out, and improvement of mechanical and kitchen facilities.

Air-conditioning of the hotel has been delayed because of engineering problems. Installation of window units would make it impossible to get to the outside to clean or service the windows except by the use of scaffolds. A solution would be to remove the old frames and windows and install new ones, a very expensive procedure. Another

Whether the accumulation in any one year was for the reasonable needs of the business depends on the needs of the business, including anticipated needs as they existed during that particular year. *K O M A, Inc.* v. *Commissioner*, 189 F. 2d 390 (C. A. 10, 1951), affirming a Memorandum Opinion of this Court dated December 14, 1949; *McCutchin Drilling Co.* v. *Commissioner*, 143 F. 2d 480 (C. A. 5, 1944), affirming a Memorandum Opinion of this Court dated July 31, 1943.

Petitioner had accumulated $629,668.99 by the end of 1951 and accumulated a further $80,193.14 in 1952, the year here involved, for a total accumulated surplus of $708,660.81. The petitioner has alleged as grounds for the accumulation (1) a need for each constituent hotel in the Carter Hotels chain to contribute to the acquisition of new members, (2) a need to establish a surplus in view of the alleged economic depression in the hotel industry, (3) the need to purchase the Hotel Lincoln in order to protect the competitive position of the Hotel Dixie, (4) the need for general renovation of the hotel, (5) the

method of air-conditioning would require installation of ducts, necessitating the construction of false ceilings, partitions, and other consequent alterations and redecorating. Considerable revenue would also be lost during such renovations.

Engineering studies of this problem of the application of air-conditioning to existing structures has led to the advancement of novel solutions. One of the new methods involving a cooling system that uses the existing radiators is being tried by the Hotel Taft, which is now in the process of air-conditioning its complete building. Its cost for this installation is more than $800.00 per room. Since this installation would involve an expenditure of more than $500,000.00, the taxpayer's management is waiting to see how the new system at the Taft operates before making a decision as to the method it will follow for air-conditioning the Dixie.

Installation of television had been deferred because the tremendous technical strides recently made in this field, including color transmission and flat screen projection had convinced taxpayer's management that presently available receivers would shortly become obsolete. Despite this conviction, taxpayer has been obliged, because of competitive pressures, to place orders for installation of the presently available black and white receivers, amounting to about $115,000.00. This installation is now in progress.

Taxpayer's present commitments for the television installation, construction now going on of new marquees at both the 42nd Street and 43rd Street entrances, lobby renovations and certain other alterations amount to approximately $200,000.00.

In addition to the modernization and rehabilitation program, taxpayer is faced with the necessity of rebuilding the basement area which is now occupied by the Dixie Bus Terminal under a lease which expires in 1957. It is quite possible that the bus terminal operations will cease even before the expiration of the lease because its business has been seriously curtailed since the New York Port Authority Bus Terminal commenced operations. During the taxable year 1952, taxpayer's management feared that this terminal would not be able to continue after the Port Authority Terminal, which began operating in 1951, got into full swing. Indeed, rentals received by the taxpayer from the terminal dropped from more than $105,000.00 annually before 1951 to about $50,000.00 a year for 1952 and later years.

The premises used by the bus terminal are open to the street and are adapted solely for the use of the present tenant. Therefore, when this area becomes vacant taxpayer will have to make very substantial alterations to close the area from the street and to convert it for use as stores or offices in an attempt to recoup at least part of the rental income, that will be lost. The cost of such rehabilitation is estimated to approximate $300,000.00.

The modernization and rehabilitation of the hotel premises is needed to maintain taxpayer's competitive position and expenditures for this purpose were anticipated prior to December 31, 1952. Earnings of prior years were properly and prudently retained to provide funds for this purpose.

need to adapt the basement to use other than as a bus terminal, and (6) the need to install air conditioning and television.

Considering each of these claims in order, petitioner asserted in its statement filed with the respondent pursuant to section 534 of the 1954 Code that each member of the Carter Hotels chain is required to contribute to the acquisition of new members in order that the overall operation be made more efficient and more profitable to each member of the group. In order for the statement filed by a taxpayer under section 534 (c) to be operative insofar as shifting the burden of proof to the respondent is concerned, the statement must not only show the grounds for the accumulation but must state facts sufficient to show the basis of those grounds. In the case of this particular ground for the accumulation, the statement filed by petitioner does not state such sufficient facts and is, thus, inadequate for the purpose

---

Footnote 1—Continued.

### III.

The hotel business in general and the transient metropolitan hotel business in particular have suffered at least two severe economic depressions in the past twenty-five years. The taxpayer's own hotel sustained huge losses during the economic depression of the thirties. The extent of this risk is revealed by the financial history of the hotel industry. It is especially intense in the New York metropolitan area, as is shown by the fact that virtually no new hotel construction has taken place in this area since the thirties. The reason for this lack of new construction is that conservative financial interests regard the New York metropolitan area hotel industry as too risky to warrant heavy investment.

Hotels in the Times Square area are particularly susceptible to the effects of dips in economic activity as their business depends so much on luxury trade, holiday tourists and vacationers.

Taxpayer maintains that as a result of these conditions its surplus is reasonably required as a reserve against the effects of economic depression.

### IV.

The rapid growth of chain hotel operation in the past few years has proven conclusively that chain operation is more efficient and profitable than individual hotel operation. Such operation makes it possible to secure the services of expert designers, engineers, food specialists and others otherwise not available to the smaller operator. Mass purchasing power produces substantial economies in daily operation, in repairs and maintenance, and in installations and improvements. Inventories can be better managed and more efficiently controlled, which is an extremely important factor in an industry whose demand is subject to seasonal and weekly variations which are difficult to predict. The larger the chain, for all these reasons, the more efficient the operation, up to a very substantial size.

The taxpayer's successful operation in the past has been due in no small measure to its membership in the "Carter Hotels" chain managed by Hyman B. Cantor. In order for chain operation to continue to be successful, it is highly desirable to expand and to plan for the acquisition of new units, and the Carter chain is no exception. Since the acquisition of such units requires large outlays of cash, the taxpayer, as a unit of the Cantor-managed chain, must be prepared to supply its part of the resources necessary for chain expansion.

That this is the normal anticipation of the hotel chain under modern conditions is shown by the rapid growth of the Sheraton chain and the Hilton chain and others, published reports of which indicate constant acquisition of new units, and continued trend to larger numbers of units for more profitable operation. The taxpayer's chain has been actively engaged in the search for new units for similar acquisition. One new unit has been so acquired within the past year, and active steps have been taken looking toward other such acquisitions.

The outlay for the acquisition of any one unit can reasonably be estimated to be more than one million dollars in cash, and the taxpayer's accumulated surplus may reasonably be required in order to meet its share of the costs of such acquisitions.

of shifting the burden. The statement declared only that the Carter chain had been engaged actively in the search for new units, and that the cost of such acquisition could "reasonably be estimated to be more than one million dollars in cash." No facts were stated showing to what extent new acquisitions would make the existing operation more efficient or profitable. No facts were stated to show that the Carter chain was seeking to acquire any particular hotel. No facts were stated showing that petitioner's officers and board of directors ever discussed such a plan, let alone formulated or authorized any specific commitment in this connection. Moreover, no evidence was introduced at the trial which overcomes these deficiencies. The entire record is devoid of any evidence supporting this ground for accumulation.

On the facts before us, the petitioner's allegation of economic depression in the hotel industry is unacceptable as a ground for the accumulation of surplus. The petitioner submitted a nationwide statistical survey of some 375 hotels which indicated a declining rate of room occupancy during the years 1945–1952. However, despite the record of the remainder of the hotel industry, the affirmative evidence that the petitioner's own occupancy rates remained at a relatively high level throughout these years and was higher than that of most of its competitors in the Times Square area disproves the contention. Morever, here again the statement filed under section 534 states no facts showing any discussion, planning, or action on the part of petitioner's officers and directors with respect to this particular ground for accumulation, nor was any evidence offered to show such facts at the trial.

Petitioner declared in the statement filed with respondent in 1955 that it would need $3,000,000 for the purchase of the Hotel Lincoln and substantial amounts in addition for its subsequent rehabilitation, or that, in the alternative, it would need considerable sums for renovation of the Hotel Dixie in the event that the Lincoln was purchased and then remodeled by some other interest. The expansion or improvement of existing facilities of a business may be a reasonable need for the purposes of section 102. See *William C. De Mille Productions, Inc.*, 30 B. T. A. 826 (1934), appeal dismissed 80 F. 2d 1010 (C. A. 9, 1936). However, petitioner asserted that the purpose for the attempted purchase of the Hotel Lincoln was simply to eliminate a possible source of competition, without stating any facts to show how its ownership and rehabilitation of the Lincoln would protect the Hotel Dixie operation. Furthermore, even if we were to accept the purchase of the Lincoln as a possible reasonable business need of Dixie, the weight of the evidence is that the negotiations for its purchase were not conducted on the petitioner's behalf. All the evidence

leads to the conclusion that the negotiations, such as they were, were conducted by or on behalf of Hyman B. Cantor, the owner of petitioner, in his personal capacity rather than that the Lincoln was intended to be acquired by petitioner.

While a program of extensive renovation of its facilities might well have represented a reasonable business purpose for at least a portion of petitioner's accumulation in 1952, the petitioner has failed completely to establish what sums it intended to spend or were needed for this purpose at that time. Except in the case of air conditioning and televising, which are considered separately below, petitioner's 1955 statement did not state any facts showing what amount was required in this connection or how much the petitioner's management in 1952 contemplated that such a general renovation would cost. Nor did it state facts showing that petitioner's officers and directors did in fact consider such a program in 1952. Under these circumstances, while we might be willing to assume that some renovation was required, the petitioner's statement filed in 1955 was insufficient to relieve it of the burden of establishing what amounts were required for this purpose. No evidence was offered at the trial which would establish such amounts.

Petitioner's statement filed with the respondent in 1955 stated a need to accumulate $300,000 to meet the cost of converting the basement upon the anticipated loss of the bus terminal as a tenant, without stating the facts upon which this or any other estimate made in this connection was grounded. Cantor, petitioner's sole stockholder, testified that the building engineer, based upon that individual's examination of the structure in 1952, estimated a possible cost of $500,000 for a complete conversion of the basement involving removal of the supporting columns. The engineer himself did not testify. No written report made by him at the time of his supposed survey of the structure was offered or, so far as we know, was ever made. We do not know all of the assumptions used in his estimate or what factors he took into account. We do not even know what, if any, were his qualifications as an "engineer." Under the circumstances, the $500,000 estimate is entitled to little weight. Moreover, even if we were inclined to accept the estimate itself as reasonable, the basis for that estimate was apparently only one of a number of alternative plans for conversion of the basement, and there is no evidence that petitioner's officers or directors adopted it or any other plan of remodeling. On the contrary, the weight of the evidence indicated that they hoped to find a new tenant who could use the basement facilities as they existed, with little or no renovation being required. As of the date of trial, no remodeling of the basement had been undertaken or authorized.

While the petitioner's statement filed in 1955 declared that the cost of air conditioning might reach $500,000, evidence at the trial showed that in 1952 about $300,000 was expected to be sufficient. The 1955 statement declared no facts showing what expenditure for television had been contemplated in 1952 and stated only the amount of orders which had since been placed in this connection. However, the evidence indicates that in 1952 it was anticipated that the installation of television would cost between $120,000 and $150,000. As set forth in our Findings of Fact, the petitioner has actually made substantial expenditures with respect to both air conditioning and television since 1952. While evidence of what the petitioner in fact did subsequent to 1952 does not of itself prove or disprove the reasonableness of an accumulation in that year, it bears upon the weight to be attached to the evidence of petitioner's intentions in 1952. We are willing to accept as reasonable the accumulation of up to $450,000 for air conditioning and television.

Petitioner had accumulated $708,660.81 by the end of 1952, of which amount we have accepted as reasonable the accumulation of $450,000 for air conditioning and television. Of the remaining $258,660.81, the respondent has only determined $80,193.14 to have been for the purposes prohibited by section 102. With respect to the need for general renovation of the hotel and possible conversion of the bus depot, we would suppose that some accumulation might be reasonable. However, petitioner has failed to show, either by the statement filed by it pursuant to section 534 or by evidence introduced at the trial, what amounts were reasonably anticipated to be needed in either instance. With respect to the other grounds for accumulation asserted by it, the petitioner has either failed in its statement filed pursuant to section 534 to state facts sufficient to support the grounds themselves or the weight of the evidence establishes affirmatively that there was no basis for the asserted ground. Additionally, we think the fact that since its inception in 1942, petitioner has failed to pay any dividends while at the same time it had accumulated a surplus in the amount of $708,660.81 by the end of the year in question is affirmative evidence of the fact that petitioner was availed of to avoid the imposition of surtax upon its shareholder. Section 102 makes the fact of an unreasonable accumulation determinative of the purpose to avoid surtax upon its shareholders.

Under all the circumstances and upon the entire record, we conclude that the respondent did not err in determining that the accumulation of $80,193.14 in 1952 was for the purpose of preventing the imposition of surtax upon the petitioner's shareholder.

*Decision will be entered for the respondent.*