EARNEST BOOTH, M.D., P.C., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Booth v. Commissioner
Docket No. 7854-80.
United States Tax Court
T.C. Memo 1982-423; 1982 Tax Ct. Memo LEXIS 320; 44 T.C.M. (CCH) 595; T.C.M. (RIA) 82423; July 27, 1982. Peter I. Chirco, for the petitioner. Larry D. Anderson, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for the fiscal years ended *322 June 30, 1975, and June 30, 1976, in the amounts of $610 each year under section 11 [1] and the amounts of $11,265 and $14,042 under section 531, respectively. The issue for decision is whether for its fiscal years ended June 30, 1975, and June 30, 1976, petitioner was availed of for the purpose of avoiding income taxes with respect to its shareholder by permitting its earnings and profits to accumulate beyond the reasonable needs of its business. [2]
*323 FINDINGS OF FACT Petitioner Earnest Booth, M.D., P.C., is a corporation organized under the Michigan Professional Service Corporation Act, Mich. Stat. Ann. sec. 21.315, on September 18, 1968.Its office was located in Southfield, Michigan, at the time of the filing of the petition in this case. Petitioner filed its Federal corporate income tax returns, Forms 1120, for its fiscal years ended June 30, 1975, and June 30, 1976, with the Central Service Center, Covington, Kentucky. These returns were prepared on the cash basis of accounting. Earnest Booth, M.C., is, and has been since the organization of Petitioner, its sole shareholder. Dr. Booth exercises full control over petitioner. Dr. Booth is a pathologist. He was born on August 30, 1927. After graduating from medical school, he served three years of internship and four years of residency and qualified as a pathologist. In 1958 he was certified by the American Board of Clinical and Anatomical Pathologists. On March 19, 1973, Petitioner entered into a contract with Hutzel Hospital, a Michigan nonprofit corporation. The contract provided that the hospital retained the corporation to manage the laboratories and blood bank *324 and pathology department of the hospital. Under the terms of the contract, Dr. Booth was to serve as chief pathologist for the hospital and be directly responsible for supervision of all professional personnel employed or retained by the corporation. The contract further provided that-- The Corporation agrees that Dr. Booth and each of the associate pathologists or physicians employed or retained by its shall be covered by malpractice insurance of at least Two Hundred Thousand ($200,000.00) Dollars per act, and Six Hundred Thousand ($600,000.00) Dollars per occurrence, with appropriate coverage insuring each such associate as to liability, if any occasioned by the malpractice of this fellow employees or associates.* * * The contract further provided that in the performance of these medical responsibilities and obligations under the contract, the corporation shall at all times be acting and performing as an independent contractor. The hospital agreed to provide the corporation with facilities and personnel other than the pathologists employed by the corporation necessary to the operation of the laboratories and blood bank and pathology department. However, it was understood *325 that Dr. Booth would direct the operation of the personnel employed by the hospital. The contract provided for the compensation of petitioner for the services rendered. The duration of the agreement was a period of 10 years unless terminated by petitioner or because of the death or total disability of Dr. Booth. In the event of the death or total disability of Dr. Booth, the contract automatically terminated. In the event Dr. Booth became partially disabled for a period of 6 months or longer and the disability was of such a nature as to impair his ability to perform the services required of him by the contract, the hospital had the right to terminate the agreement by 30 days' notice in writing to that effect. There was no right in the hospital to terminate the agreement for any reason other than the death or disability of Dr. Booth. However, the agreement provided that petitioner had the right to terminate the agreement for any reason upon 6 months' notice in writing to the hospital. Upon its incorporation in 1968, petitioner entered into an agreement with Hutzel Hospital comparable to the one entered into on March 19, 1973. In 1971, Dr. Booth, on behalf of petitioner, gave *326 the requisite 6 months' notice of termination and entered into a comparable contract on behalf of petitioner to operate the pathology laboratory of Mt. Carmel Hospital. After approximately a year and a half, he gave notice to Mount Carmel Hospital of his election to terminate that agreement to permit him to enter into the March 19, 1973, agreement with Hutzel Hospital which was in effect during the years here in issue.Under Petitioner's contract with Hutzel Hospital, its compensation was a percentage of the laboratory fees charged by the laboratory. Dr. Booth was paid a salary by petitioner. For its fiscal year ended June 30, 1972, petitioner paid Dr. Booth a salary of $130,000. For each of its fiscal years ended June 30, 1973, 1974, and 1975, it paid Dr. Booth a salary of $142,000. For its fiscal year ended June 30, 1976, petitioner paid Dr. Booth a salary of $148,000. The following schedule shows the retained earnings of petitioner at the beginning and end of its fiscal year 1975 and the end of its 1976 fiscal year and the current retained earnings for each of its fiscal years 1975 and 1976: Taxable Year
Retained
Current
Ending
Earnings
Retained Earnings
7-1-74
$282,893
6-30-75
320,568
$39,693
6-30-76
370,360
49,792
*327 Petitioner on its Federal income tax return for each of its fiscal years ended June 30, 1975 and 1976, showed the following income and expenses and taxable income: Year
Year
Ended
Ended
6-30-75
6-30-76
Gross Receipts
$378,554
$441,862
Interest income
2,575
Total income
$378,554
$444,437
Salary - Dr. Booth
$142,000
$148,000
Salaries - other
62,191
89,657
Contribution to pension plan
80,277
95,945
Insurance expense
5,467
10,711
Legal and accounting
10,335
8,561
Taxes
11,077
12,292
Other
10,255
9,479
Total expenses
$321,602
$374,645
Taxable income
$ 56,952
$ 69,792
Federal income tax
$ 17,259
$ 20,000
No formal dividends were declared by petitioner during its fiscal years ended June 30, 1970, through June 30, 1977. The equipment which Hutzel Hospital had in its pathology laboratory for the use of Dr. Booth and his associates had a value of over $500,000 during each of the years here in issue. During each of the years here in issue, the pathology department which Dr. Booth supervised performed approximately 3,000,000 laboratory tests per year. During these years, Dr. Booth was responsible as supervisor for the *328 work of three other pathologists and 160 medical technologists, technicians, and laboratory assistants. The work performed in the pathology laboratory was performed generally at the direction of physicians practicing on the staff of Hutzel Hospital. During the years here in issue, approximately 550 physicians were on the staff of Hutzel Hospital. Petitioner carried its basic malpractice insurance during the years here in issue and for some years prior and subsequent thereto with Medical Protective Company of Fort Wayne, indiana. The insurance coverage ran from December 1 of one year to December 1 of the next year. For the period December 1, 1973, to December 1, 1974, petitioner's coverage with Medical Protective Company was $200,000 per event and $600,000 total. This policy was amended effective May 23, 1974, to $1,000,000 per event and $1,000,000 total. For the period December 1, 1974, to December 1, 1975, the malpractice insurance petitioner carried with Medical Protective Company was $1,000,000 per event and $1,000,000 total. For the period December 1, 1975, to December 1, 1976, the insurance coverage with Medical Protective Company was $200,000 per event and $600,000 *329 total. For the period December 1, 1976, to December 1, 1977, this insurance was $100,000 per event and $300,000 total. For years prior to the period December 1, 1976, to December 1, 1977, petitioner's policy had also covered Dr. Booth. For the year December 1, 1976, to December 1, 1977, in addition to the policy carried by petitioner, Dr. Booth carried a personal policy of coverage of $100,000 per event and $300,000 total. For the period December 1, 1977, to December 1, 1978, petitioner carried malpractice insurance coverage of $200,000 per event and $600,000 total.All of the pathologists employed by petitioner also carried personal malpractice insurance during each of the years here in issue. in addition to the basic malpractice insurance carried by petitioner with Medical Protective Company for the period September 17, 1972, to September 17, 1975, petitioner carried an excess limits policy with St. Paul Insurance Company of $1,000,000 of malpractice insurance. The policy, which was taken out on September 17, 1972, was a three-year policy.This policy was not renewed on September 17, 1975, because St. Paul Insurance Company lost its authority to sell malpractice insurance in the *330 State of Michigan because a new form which it submitted to the State was not approved. St. Paul Insurance Company sold its insurance through independent agents. In August 1975, when petitioner was notified that St. Paul Insurance Company would not be authorized to write insurance in the State of Michigan after September 17, 1975, petitioner was informed by the independent agent who had procured the policy with St. Paul Insurance Company for petitioner that petitioner could procure an excess limits policy of $1,000,000 with Interstate Fire and Casualty Company.
Both the Medical Protective Company and St. Paul Insurance Company determined premiums for medical malpractice insurance according to their estimation of the risks and hazards inherit in the particular speciality of the physicians being covered. Each of these companies has five classes of physicians covered by insurance. Of the five classes of physicians insured by both Medical Protective Company and St. Paul Insurance Company, pathologists are in the lowest classification of risk.
The State of Michigan required that insurance companies doing business in that State submit to the State Insurance Bureau a completed form when *331 an insurance claim had been filed and another completed form when the claim had been settled. The information submitted to the State Insurance Bureau by companies doing business in the State of Michigan was compiled by the National Association of Insurance Commissioners into a statistical report showing information with respect to claims filed and claims paid in the State of Michigan during the years 1975 through 1978. The statistics compiled in this report included claims disposed of by settlement prior to trial and by verdicts at trials. For the years 1975 through 1978, the average amount of indemnity paid by all insurance companies for malpractice claims against all physicians in Michigan was as follows: Year
Amount
1975
$16,027
1976
14,944
1977
21,465
1978
18,297
The average amount of indemnity paid by the Medical Protective Company during the period 1975 through 1978 for malpractice by physicians was $12,617 and the average amount of indemnity paid by St. Paul Insurance Company during this same period was $19,772. During the period 1975 through 1978, there were only six claims made in the State of Michigan for malpractice by pathologists. In February *332 1980, a complaint was filed against Hutzel Hospital, three surgeons and two of the pathologists employed by petitioner. The act assigned as malpractice in these complaints had occurred on May 17, 1976.Petitioner was not named in the suit. This suit was pending unresolved at the time of the trial of this case. In August 1975, a Dr. Teitelbaum filed a complaint against two pathologists who practiced in Grace Hospital in Michigan and against a Michigan professional corporation by whom these two pathologists were employed. In July 1979, consent judgments in the amount of $325,000 were entered against each of the individual pathologists against whom the suit was filed. There is no indication in the record of what was done with respect to the suit against the professional corporation. However, the record does show satisfaction of the judgment in full by each of the physicians. The $325,000 entered was without costs and without interest and was the full amount owed by the individual doctor defendants under the consent judgment order. Petitioner carried no reserve on its books for malpractice self insurance. It did not carry a reserve on its books for malpractice lawsuits. *333 The arrangement that petitioner had with Hutzel Hospital was comparable to the arrangements that most hospitals have for the operation of their pathology laboratory. Although there are differences in the amounts, most hospitals compensate the doctor or professional corporation operating the pathology department on the basis of a percentage of the receipts from work done in the pathology laboratory. Some have a fixed amount of compensation in addition and others do not. Dr. Booth was highly regarded by the administration of Hutzel Hospital and also by the administration of Mt. Carmel Hospital. When petitioner canceled its contract with Hutzel Hospital and when it canceled its contract with Mt. Carmel Hospital, it was at Dr. Booth's request and not at the instigation of the hospital. During the course of an audit of petitioner's Federal income tax returns for its fiscal years ended June 30, 1973, and June 30, 1974, the examining agent proposed to recommend the imposition of an accumulated earnings tax under section 531.Representatives of petitioner told the agent that petitioner was reserving funds for possible medical malpractice lawsuits. Respondent's agent requested all minutes *334 of the corporation and was furnished the minute book which covered the period September 1968 to March 12, 1974. There was no reference in any of these minutes to any necessity for retention of earnings for possible malpractice lawsuits. The only reference in any of these minutes to malpractice is a statement in the minutes of September 1969 that the corporation is to pay the malpractice insurance for all its employees. The agent was investigating petitioner's fiscal years 1973 and 1974 returns during May and June 1975. During the course of the examination, petitioner's representatives informed the agent that it was the intent of the corporation to make dividend distributions in the very near future. For this reason, the examining agent did not recommend the assertion of an accumulated earnings tax under section 531 against petitioner for its fiscal years 1973 and 1974. At the meetings petitioner's directors held shortly after June 30, 1975, and shortly after June 30, 1976, which were attended by the representatives of petitioner who had represented petitioner in the investigation of petitioner's tax liability for the fiscal years 1973 and 1974, a discussion was held with respect *335 to the need by petitioner for funds to cover possible malpractice lawsuits. On May 23, 1979, respondent issued by certified mail a notification to petitioner pursuant to section 534 that he proposed to issue a statutory notice of deficiency to petitioner for its fiscal years 1975 and 1976 setting forth an amount with respect to the accumulated earnings tax imposed by section 531. In early July 1979, petitioner filed with respondent "Statements of Grounds Relied Upon by the Taxpayer for the Accumulation of Funds Needed by the Business." After reciting the nature of petitioner's operations, this statement was as follows: In the case of the present taxpayer, the surplus was not excessive for two reasons as follows: i. It is entirely possible that a lawsuit or a number of lawsuits may be instituted against the corporation beyond the present limits of possible insurance coverage of $100,000.00 per occurrence and $300,000.00 in the aggregate. (Although an additional $100,000.00 - $300,000.00 is issued to each doctor, this additional amount may not be available to the Corporation.) Furthermore, that insurance coverage is cancellable at the will of the insurer and may not be available *336 in the future. The corporation should reserve a substantial sum annually for potential lawsuits. ii. The corporation operates its business out of premises owned by Hutzel Hospital. It uses and relies on equipment costing over $500,000.00 belonging to Hutzel Hospital. If the contract with the Hospital is not renewed the corporation would be out of business unless a new contract was obtained or it was financially able to purchase the bildings and equipment necessary to continue its practice. Therefore a substantial reserve for the possible purchase of equipment or a building is proper under such circumstances. In the notice of deficiency issued to petitioner on March 10, 1980, determining the tax under section 531, the following explanation is given: It is determined that you were formed or available of for the purpose of avoiding the income tax with respect to your shareholder by permitting earnings and profits to accumulate instead of being divided or distributed during the taxable years ended June 30, 1975, and June 30, 1976. Accordingly, the accumulated earnings tax provided by Section 531 of the Internal Revenue Code is being asserted for these *337 taxable years. In determining your accumulated earnings credit under the provisions of Section 535 of the Code, consideration was given to the statement dated July 2, 1979, filed by you in response to the notification sent to you by certified mail on May 23, 1979, pursuant to Section 534(b) of the Code. It is determined that the information set forth in your statement is not sufficient to establish that any part of your earnings and profits for the taxable years ended June 30, 1975, and June 30, 1976, was retained for the reasonable needs of your business. Inasmuch as you do not qualify for the minimum accumulated earnings credit provided for in Section 535(c) (2) of the Code, no accumulated earnings credit has been allowed in the computation of the accumulated earnings tax. OPINION Section 531 imposes a tax on the accumulated taxable income of every corporation described in section 532. Section 532 provides that the accumulated earnings tax applies to every corporation formed or availed of for the purpose of avoiding the income tax with respect to its shareholders. Section 533(a) *338 provides that for the purpose of section 532, the fact that earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to its shareholders unless the corporation by a preponderance of the evidence shall prove to the contrary. Section 534 deals with whether petitioner or respondent has the burden of proof. It provides that where a corporation is notified of respondent's intent to assert an accumulated earnings tax and submits a statement within the time allowed of the grounds, together with facts sufficient to show the basis thereof, on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business, the burden shall be on respondent with respect to the grounds set forth in the statement submitted. Section 353 provides for the method of computing the accumulated taxable income to which the accumulated earnings tax is applicable. Section 537 provides that the reasonable *339 needs of a taxpayer's business include the reasonable anticipated needs. The record here shows that respondent notified petitioner of his intent to determine an accumulated earnings tax for petitioner's fiscal years ended June 30, 1975 and 1976, and petitioner filed the statement of grounds referred to in section 535. We have recited the grounds assigned by petitioner in our findings of fact. The first ground assigned by petitioner is the possibility that a lawsuit might be instituted against the corporation beyond the limits of its insurance coverage and the second is that petitioner might lose its contract with Hutzel Hospital and have to equip a laboratory. No facts were assigned to support the two grounds set forth.Since the statement contained no facts in support of the alleged grounds, it is insufficient to shift the burden of proof to respondent on the two grounds claimed in the statement to justify the accumulation of earnings by petitioner. Dixie, Inc. v. Commissioner,31 T.C. 415, 427 (1958). See also Chatham Corp. v. Commissioner,48 T.C. 145, 147 (1967), and cases there cited. Although we conclude that the statement filed by *340 petitioner was insufficient to shift to respondent the burden of proof as to whether petitioner permitted its earnings and profits to accumulate beyond the reasonable needs of its business, we are also satisfied from the evidence, without regard to which party has the burden of proof, that petitioner's earnings and profits were permitted to accumulate beyond the reasonable needs of its business in both its fiscal year 1975 and its fiscal year 1976. This record shows that during the years here in issue petitioner for most of the period had $1,00,000 primary coverage for malpractice insurance and for part of the time had $1,000,000 in excess limits. The record also shows that, during the approximate six months when petitioner had only $200,000/$600,000 of malpractice insurance coverage, the doctors working for the corporation other than Dr. Booth also carried malpractice insurance and Dr. Booth was covered individually by petitioner's malpractice insurance. Sec. 21.315(6) of the Michigan Professional Services Corporation Act provides that any officer, shareholder, agent, or employee of a *341 corporation organized as a professional service corporation shall remain personall and fully liable for any negligence or wrongful act committed by him, and that nothing contained in the act shall be interpreted to abolish, repeal, modify, restrict, or limit the law now in effect applicable to the professional relationship and liabilities between the persons furnishing professional services and the persons receiving such services. [3] The act then further provides that-- *342 The corporation shall be liable up to the full value of its property for any negligent or wrongful acts or misconduct committed by any of its officers, shareholders, agents or employees while they are engaged on behalf of the corporation in the rendering of professional services. It is clear under this act that the primary liability is on the doctors employed by the corporation and that the corporation has only limited liability up to the amount of its property. Whereas the individual doctors employed by petitioner might be personally liable for any amount of damages that might be determined against them for malpractice, the corporation's liability is limited. The record here shows that petitioner did not set up any reserve for possible payments it might have to make on malpractice lawsuits and that no mention of any possibility of such payments by the corporation was made in the minutes of the corporation until after a revenue agent had proposed an accumulated earnings tax for petitioner' fiscal years 1973 and 1974. The clear implication from the record is that the need by petitioner to accumulate earnings to cover any possible malpractice judgments is an afterthought occasioned *343 by the proposal to determine an accumulated earnings tax against it. The record also shows that at no time up through the years here involved had any suit for malpractice actually been instituted against petitioner or any of the doctors working for petitioner and that judgments on the average in the State of Michigan were well below petitioner's insurance coverage. The record shows that of all doctors in Michigan covered by malpractice insurance, pathologists were in the lowest premium range because they were considered to be the lowest risk of any doctors covered by malpractice insurance. Petitioner did show that over three years after the close of its fiscal year 1976 a suit was instituted against two of the doctors employed by the corporation. However, this suit did not include the corporation as a defendant. Petitioner offered in evidence pleadings and judgments in a suit by a doctor against two pathologists who practiced at Grace Hospital in Michigan and a Michigan professional corporation. The judgments were against the two pathologists. The record does not show how the suit against the professional corporation was concluded, but the inference is that no judgment was rendered *344 for damages against the professional corporation. The record further shows that for the period 1975 through 1978 only six claims for damages for malpractice had been filed in the entire State of Michigan against pathologists. The record in this case is clear that any need for petitioner to accumulate any funds in addition to the over $282,000 of retained earnings it had at the beginning of its fiscal year 1975 and over $320,000 in retained earnings it had at the beginning of its fiscal year 1976 for the purpose of some possible lawsuit against one of its pathologists is far too speculative to be considered to be a reasonable need of petitioner's business. Petitioner's second claimed ground for the need to accumulate its earnings during the years here in issue is also speculative. Petitioner's contract with Hutzel Hospital had approximately seven years to run at the close of the last fiscal year here in issue. The contract could not be canceled by the hospital except upon the death of incapacity of Dr. Booth. The administrator of the hospital testified that the hospital was highly satisfied with Dr. Booth's services and the record is unquestionably clear that there was no probability *345 of petitioner's contract with Hutzel Hospital not being renewed at the end of seven years after the close of the last year here in issue. While section 537 does provide that the term "reasonable needs of the business" includes the reasonably anticipated needs of the business, it is clear that for a need to be a reasonably anticipated need there must be some indication that the future needs of the business required the accumulation and the corporation must have a specific, definite and feasible plan for the use of such accumulation. Section 1.537-1(b)(1), Income Tax Regs. The regulation provides that the accumulation need not be used immediately and the plans need not be consummated within a short time after the close of the taxable year provided the accumulation would be used within a reasonable time period. It further provides that accumulation cannot be justified on the grounds of reasonably anticipated needs of the business if the future needs are uncertain or vague or the plans are not specific. The facts in this case show no real likelihood that petitioner *346 would ever need to furnish and equip a liboratory. The evidence indicates that petitioner's contract with Hutzel Hospital is likely to be continued as long as Dr. Booth lives and is not incapacitated. The record shows that Dr. Booth, at the end of the last fiscal year here in issue, was not quite 49 years old. Certainly his death or incapacity of too speculative to be a basis for the corporation's retaining earnings because of a possibility of its contract with Hutzel Hospital being canceled. This case is different from most cases involving accumulated earnings tax in that petitioner is a professional corporation and much more the alter ego of its sole shareholder than even most other one-shareholder corporations. What would happen to the corporation upon Dr. Booth's death is far too speculative to form a basis for a reasonable need for the corporation to accumulate its earnings.Apparently, Dr. Booth was in very good health at the time of the trial of this case, approximately five years after the last fiscal year involved herein. Since we have concluded that petitioner permitted its earnings and profits to accumulate beyond the reasonable needs of its business in each of the *347 fiscal years here in issue, it follows that it is presumed that the purpose of the accumulation was to avoid tax with respect to its shareholders unless it proves to the contrary by a preponderance of the evidence. The record here shows that Dr. Booth's salary was $142,000 in one of the years here in issue and $148,000 in the other. There is no evidence that the accumulation by the corporation of earnings beyond the reasonable needs of its business was not for the purpose of avoiding income tax with respect to its sole shareholder, Dr. Booth. Because petitioner has failed to meet its burden of proof in rebutting the statutory presumption, we conclude that the corporation permitted its earnings and profits to accumulate beyond the reasonable needs of its business for the purpose of avoiding income tax with respect to its shareholder and therefore is subject to the accumulated earnings tax imposed by section 531. See Ivan Allen Co. v. United States,422 U.S. 617, 628 (1975). Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue. ↩
2. Although petitioner put in issue in the petition the disallowance of $1,270 each year of claimed automobile expense deduction, no evidence was introduced in this connection at the trial. We therefore assume petitioner has abandoned this issue which resulted in the deficiency of $610 for each of the years here in issue determined under sec. 11. The parties also argued whether the statement submitted by petitioner under sec. 534(c) was sufficient to shift the burden of proof with respect to the reasonable needs of petitioner's business to respondent. We view this as merely a part of the overall issue presented herein. See p. 15, infra.↩
3. Mich. Stat. Ann. sec. 21.315(6) (Callaghan 1974) provides as follows: Nothing contained in this act shall be interpreted to abolish, repeal, modify, restrict or limit the law now in effect in this state applicable to the professional relationship and liabilities between the person furnishing the professional services and the person receiving such professional service and to the standards for professional conduct.Any officer, shareholder, agent or employee of a corporation organized under this act shall remain personally and fully liable and accountable for any negligent or wrongful acts or misconduct committed by him, or by any person under his direct supervision and control, while rendering professional service on behalf of the corporation to the person for whom such professional services were being rendered. The corporation shall be liable up to the full value of its property for any negligent or wrongful acts or misconduct committed by any of its officers, shareholders, agents or employees while they are engaged on behalf of the corporation in the rendering of professional services.↩