Walter C. McMinn, Jr., and Lucretia McMinn v. Commissioner. McMinn's Industries, Inc. v. Commissioner.
McMinn v. Commissioner
Docket Nos. 85624, 85625.
United States Tax Court
T.C. Memo 1962-165; 1962 Tax Ct. Memo LEXIS 144; 21 T.C.M. (CCH) 913; T.C.M. (RIA) 620165; June 29, 1962
*144 1. Advances made to corporation by its president and sole stockholder and subsequently transferred from loans payable account to capital surplus account at the stockholder's request and to obtain bank credit for the corporation represent contibutions of equity capital and not loans. Subsequent repayment of the advances to the stockholder were constructive dividends, taxable as such, rather than repayment of loans. 2. Corporation held not liable for the accumulated earnings tax imposed by section 531, I.R.C. 1954, for the years 1954 and 1955, but liable for the surtax for the years 1956 and 1957. 3. Amounts deductible as travel, entertainment, and dues expenses of the corporation determined for the years 1956 and 1957. Disallowed portion of the expenses claimed were constructive dividends to sole stockholder to whom and for whose account the payments were made by the corporation. George Craven, Esq., 3 Penn. Center Plaza, Philadelphia, Pa., for the petitioners. David E. Crabtree, Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: In these consolidated proceedings, respondent has determined deficiencies in income tax and addition to tax due from petitioners in the following amounts for the following taxable years: Addition to Tax,
Sec. 6654, Docket No.
Petitioner
Year
Deficiency
I.R.C. 1954
85624
Walter C. McMinn, Jr., and Lu-
cretia McMinn
1954
$ 8,064.39
1955
45,500.71
1956
6,946.87
1957
4,968.23
$214.77
85625
McMinn's Industries, Inc.
1954
$41,627.38
1955
12,849.81
1956
4,135.88
1957
21,752.52
*147 Petitioner in Docket No. 85625 claims an overpayment of tax for the years 1954 and 1955 in the amounts of $16,802.41 and $28,403.30, respectively. The issues for decision are: (1) Whether amounts received by Walter C. McMinn, Jr. (hereafter referred to as McMinn), from McMinn's Industries, Inc. (hereafter referred to as petitioner), in the years 1954 and 1955, in payment of amounts previously advanced by McMinn to the corporation, constitute dividends or the repayment of loans. (2) Whether petitioner is liable for the accumulated earnings tax imposed by section 531 of the Internal Revenue Code of 1954, [1] for the taxable years 1954, 1955, 1956, and 1957. (3) Whether petitioner is entitled to deduct the amount of $12,691.91 in the taxable year 1956 and the amount of $10,914.50 in the taxable year 1957 as business expenses for travel and entertainment, special meetings, and dues (or alternatively as additional compensation to McMinn), or whether the amounts represent dividends to McMinn, nondeductible by petitioner. A fourth issue as to whether *148 there should be included in the income of the corporate petitioner for the years 1954 and 1955 its share of amounts claimed for work done by a joint venture in which it participated, which amounts were not paid or approved for payment in those years, and which issue gave rise to petitioner's claim for overpayment of tax, was conceded by respondent on brief. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner was incorporated under the laws of Pennsylvania on October 9, 1933, as McMinn's Inc. For several years following its incorporation, it was engaged in the business of manufacturing and selling ice cream. Several years later petitioner entered the road construction business. In 1943, petitioner was merged with Lancaster Bituminous Corporation and its name was changed to McMinn's Industries, Inc. Since 1943, petitioner has been engaged in the business of doing road-paving work under contract, in operating plants for the preparation of asphalt, and in selling oil and asphalt mix used in road surfacing. Petitioner's principal office and place of business during the period here involved was in Lancaster, Pennsylvania. Petitioner kept *149 its books and filed its income tax returns on a calendar year and an accrual basis. It filed its returns for the years involved with the director of internal revenue at Philadelphia, Pennsylvania. Walter C. McMinn, Jr., and Lucretia McMinn, husband and wife, are individuals residing in Lancaster, Pennsylvania. They filed their joint income tax returns for the years involved with the director of internal revenue at Philadelphia, Pennsylvania. Petitioner's authorized and issued capital stock in and after 1943 has consisted of 1,400 shares of common stock of the par value of $20 per share. All of this stock has been owned since October 8, 1943, by McMinn. Since the incorporation of petitioner, McMinn has been its president. His total compensation as president amounted to $20,000 for each of the years 1954 through 1957. The directors of petitioner for the year 1954 were McMinn, John McGarry, and Roberts R. Appel (hereafter referred to as McGarry and Appel, respectively). The directors of petitioner for the years 1955 through 1957 were McMinn, Appel, and Rowland E. Carter. Issue 1. Payments by Petitioner to McMinn in 1954 and 1955 From time to time through 1946 McMinn found *150 it necessary to advance funds to petitioner and to leave his salary with petitioner, the amounts of which were reflected on petitioner's books as "Loans Payable - Officer." These loans amounted to a total of $147,161.67 and payments were made on the loans by petitioner from time to time in the total amount of $62,027.61, leaving a balance owing McMinn of $85,134.06 as of December 31, 1946. As security for a part of these loans petitioner on July 19, 1937, gave McMinn a mortgage on its properties in the amount of $35,000. On several occasions prior to 1945 this mortgage was assigned by McMinn to the Lancaster County National Bank as collateral for loans to petitioner, and then reassigned to McMinn when the loan was repaid. The balance due on the obligations secured by the mortgage on December 31, 1944, at which time the mortgage was held by McMinn, was $24,000. Finding that we was running into difficulty whenever he attempted to borrow money for petitioner because of the obligations to him recorded on petitioner's books, McMinn discussed the matter with the officers of the Lancaster County National Bank and with Appel, who was counsel for the bank as well as for petitioner, as a result *151 of which and at their suggestion McMinn decided to cancel petitioner's obligations to him and have the amounts recorded as contributed surplus on the books of petitioner. On March 14, 1946, McMinn wrote Appel as follows: Roberts R. Appel, Esq., 33 North Duke St., Lancaster, Penna. Dear Bob, As of January 1, 1946 McMinn's Industries, Inc. owed me personally $35,820.00. I have decided to transfer that money to our capital surplus account. Will you kindly have this decision properly recorded on the minutes of McMinn's Industries, Inc.
Very truly yours, McMinn's Industries, Inc. /s/ Mac Walter C. McMinn, Jr., President Accordingly, on April 5, 1946, at a special meeting of the directors of petitioner, McMinn reported that as of January 1, 1946, he had canceled petitioner's obligations to him in the amount of $35,820 by making a donation to the surplus of petitioner in that amount. The directors ratified, confirmed, and approved McMinn's action in this regard and noted that his action was to be reflected on new financial statements of the company. Prior to this action McMinn was advised by his lawyer that canceling the obligations and adding the amounts thereof to capital *152 surplus would have no adverse tax consequences. The Lancaster County National Bank was notified of this action and thereafter made additional loans to petitioner. The following entries were made on the books of petitioner with respect to amounts previously carried on its books as loans payable to McMinn: [2] Date
Dec. 31, 1944
Transfer of mortgage
payable
$24,000.00
Dec. 31, 1944
Transfer of accrued sal-
ary
9,480.00
Dec. 31, 1944
Transfer of loans pay-
able - officer
16,011.67
Dec. 31, 1946
Transfer of notes pay-
able - officer
35,642.39
Total
$85,134.06
The amount of $85,134.06 remained in capital surplus on the books of petitioner until it was paid to McMinn in 1954 and 1955. Petitioner paid $15,134.06 to McMinn by check dated December 15, 1954, and $70,000, representing the balance in the capital surplus account, was paid to him by check dated February 28, 1955. The stub for the check for $15,134.06 was marked "Reduce Surplus Capital"; that for the check for $70,000 *153 was marked "Return of Advance Capital Surplus." The cancellation of the corporate obligations to McMinn as of 1944 and 1946 and the transfer of the amounts canceled to capital surplus of the corporation were contributions of capital by McMinn to the corporation. The payments of $15,134.06 and $70,000 to McMinn in 1954 and 1955, respectively, were distributions essentially equivalent to dividends. Issue 2. Accumulated Earnings Tax Under Section 531 A high percentage of petitioner's roadpaving work was done with the Commonwealth of Pennsylvania and with townships, boroughs, and agencies of the Commonwealth. Such governmental agencies have strict requirements which must be met by those who bid on road-surfacing work. In order to bid on a job governed by specifications of the Highway Department of Pennsylvania it was necessary that the bidder show ownership of net current assets of at least 20 percent of the amount of the bid. If a bid bond is required, the bonding company requires that the bidder have at least 10 to 15 percent of the amount of the bid in net current assets. Net current assets include cash, securities, and accounts receivable less accounts payable. Machinery, *154 equipment, and real estate cannot be included in current assets and equipment acquisition liabilities are not offset against current assets. If a bidder on a road-paving job was successful, he had to furnish a performance bond in the full amount of the contract which also required that the bidder have at least 20 percent of the amount of the contract in net current assets. In order to perform a road-paving contract, it is necessary that the contractor have available machinery and equipment roughly equal in value to the amount of the contract. Although the contractor may rent such machinery and equipment, it is difficult for him to make a profit if he does so and it is better if he owns at least a substantial portion of the machinery and equipment to be used. Where a contractor bids on two or more jobs at the same time, he must be in a position to carry out all such jobs in the event he is the successful bidder. Petitioner was paid amounts due on State contracts more rapidly than on other types, but even on State contracts, a month or 6 weeks was considered a short period of time for payment for work done. In 1951 petitioner obtained a job for asphalt paving a portion of the New *155 Jersey Turnpike as a subcontractor to Geo. M. Brewster & Son, Inc. (hereafter called Brewster). Petitioner's portion of that job amounted to between $2 1/2 and $3 million and petitioner was required to deposit a bond of more than $2 million. Petitioner did not have sufficient resources to provide all of the machinery and equipment to do its part of the job and was able to do its part only because Brewster provided a large portion of the machinery and equipment. Petitioner also borrowed $500,000 in order to perform the subcontract, and in order to obtain this loan McMinn was required to pledge as collateral everthing he owned personally. In 1952 petitioner entered into a joint venture with Brewster to do subcontract work on a Signal Corps depot at Tobyhanna, Pennsylvania. This work consisted largely of asphalt paving, excavation, and drainage. Petitioner and Brewster each had a one-half interest in the joint venture and McMinn acted as manager. Work at the Tobyhanna project began in 1952 and was completed in 1954. In addition to its equipment which was used on the Tobyhanna project, petitioner advanced $205,000 in cash to the joint venture. Due to a United States Government and grand *156 jury investigation of the work done on the Tobyhanna project, in which investigation neither Brewster nor petitioner was involved, the Government withheld payment of the claims of the joint venture in the amount of $228,389 for work done by the joint venture under change orders. While the amount to be paid under the claims had tentatively been agreed upon sometime prior to the trial of this case, none of such amount had been received by the joint venture or petitioner prior to trial. This amount represented practically the entire profit of the joint venture on this project. In 1954 petitioner completed a large blacktop-paving job on the Garden State Parkway in New Jersey in a joint venture with Brewster. The contract amounted to more than $1 million. In 1955 petitioner, in a joint venture with Brewster, bid on a job for paving an additional lane on the New Jersey Turnpike. The entire job involved $8 or $9 million and the blacktop-paving portion in which petitioner was interested amounted to $1 to $1 1/2 million. The joint venture did not succeed in getting the job. In 1954 and subsequent years petitioner was active in seeking paving jobs and in bidding on large and small jobs in *157 Pennsylvania and other States and in some instances in foreign countries. In addition to the jobs in Pennsylvania on which petitioner bid in those years it investigated and bid on airfield-paving jobs at Macon, Georgia; Aberdeen, Maryland; Schectady, New York; and Wilmington, Delaware, some individually and some as a joint venture with Brewster. The work involved in each of these jobs amounted to over $1 million. In 1956, McMinn heard that a large airfield was to be built in Nassau in the Bahamas. The airfield was not then being advertised for bids but McMinn knew a contractor in Williamsport, Pennsylvania, whose corporation owned a stone-crushing plant in Nassau. McMinn considered the possibility of petitioner taking over the crushing plant, crushing its own aggregate on the job, and submitting a bid for the airfield. Petitioner did not proceed with this plan. In 1956 a contract in Florida contacted McMinn with respect to the possibility of petitioner combining with his company in a joint venture to submit a bid for the paving of an airfield in the Fort Lauderdale area. McMinn went to Florida to investigate the opportunities but petitioner did not submit a bid on the project. In *158 1954 and subsequent years petitioner bid on a large number of jobs in Pennsylvania but was unsuccessful in obtaining a contract on any paving jobs in excess of $100,000 until 1959, when it was the successful bidder on a job for slightly over $100,000 in Lancaster County, Pennsylvania. However, during this period petitioner was successful bidder on 75 to 100 asphalt-paving jobs averaging less than $5,000 each. During the years 1954 to 1957 the number of employees of petitioner were 26, 22, 33, and 32, respectively. At the time of trial petitioner had 30 to 35 employees, of which 2 worked in the office and the others were outside workers. Petitioner operated a number of asphalt-mixing plants in which the liquid asphalt is mixed with stone. Petitioner used a large part of the asphalt mix prepared in its plants for its own asphalt-paving jobs but it also sold asphalt mix to other contractors and to the Pennsylvania Department of Highways for maintenance work. Petitioner also sold asphalt oil for such jobs as resurfacing and petitioner did the actual work involved in putting the oil on the highway on such jobs. In 1954 and 1955 petitioner had five or six asphalt-mixing plants in operation. *159 Two of these plants were stationary plants, built on land belonging to petitioner in Lancaster. The other plants were mobile and were constructed of much lighter material than the stationary plants. The mobile plants had a shorter useful life than the stationary plants and were generally in bad condition upon completion of a job where they had been used. One of the stationary plants was a 2-ton mixing plant; the other was a 1-ton plant. It was petitioner's experience that a plant processing a large amount of asphalt would wear out in 2 or 3 years. However, since the volume of asphalt processed at petitioner's stationary plants in Lancaster was not very high, these plants were still in operation in 1961. An estimate of the replacement cost of these two plants in 1961 was $300,000. Petitioner felt it was necessary to maintain some reserve for replacement of these stationary asphalt plants. During the years 1954 through 1957 petitioner sold a maximum of 30,000 to 40,000 tons of asphalt mix per year from its two plants in Lancaster at an average selling price of $6 per ton. Petitioner's sales of oil during the same period ran about 700,000 to 800,000 gallons per year at an average selling *160 price of 18 cents per gallon. The maximum of petitioner's accounts receivable, representing sales of asphalt mix and oil, was about $100,000 during the peak season but the average was less than $100,000 during the years 1954 through 1957. In the years 1954 to 1957 petitioner owned two buildings which petitioner was unable to rent because of their rundown condition. Petitioner spent approximately $60,000 to $70,000 in 1958 to renovate these buildings. After the buildings were renovated petitioner tried unsuccessfully to rent them and then operated a food market and general merchandise store in the buildings. It invested about $100,000 in store fixtures and merchandise. Soon afterwards it sold the fixtures and rented the buildings and in 1961 was receiving an annual rental from the buildings of approximately $10,500. The corporation has another building which could be productive of income through the making of improvements. An estimate of the cost of making such improvements is $80,000. Prior to 1955 petitioner customarily rented its machinery and equipment when it was not in use. After completion of its rather large contracts in 1954, after which petitioner was unsuccessful in obtaining *161 additional large contracts, a large part of petitioner's machinery and equipment was sitting in petitioner's yards. McMinn felt that the machinery and equipment were depreciating about as rapidly as if they were being used and decided that rather than let them continue to deteriorate it would be better to sell them and keep the proceeds in liquid form so that if petitioner succeeded in getting new jobs, it could buy new machinery and equipment. In the year 1955 petitioner sold machinery and equipment for approximately $325,000, and some additional equipment in 1956, and invested a considerable portion of the proceeds in stocks and bonds. Petitioner disposed of most of these investments in 1955 and 1956. In 1956 petitioner loaned $275,000 to McMinn, who repaid this sum to petitioner without interest in 1957. McMinn used the proceeds of this loan to purchase stock and securities in his own name for the purported reason that the corporation had incurred losses on its investments and he felt that any risk of loss on securities transactions should be borne by him individually rather than the corporation. McMinn actually sustained capital losses on the sale of these securities in 1957. Upon *162 repayment of this loan petitioner invested the funds in Government bonds until such time as it needed the funds to renovate its buildings and purchase additional machinery and equipment in the years 1958, 1959, and 1960. During the years 1954 to 1957, inclusive, petitioner had machinery and equipment and automotive equipment of the following book value in those years: 1954
1955
1956
1957
Machinery and equipment
$297,608.17
$ 96,301.60
$ 33,966.60
$ 44,691.21
Automotive equipment
108,983.14
55,167.51
71,567.51
107,663.87
Total
$406,591.31
$151,469.11
$105,534.11
$152,355.08 Petitioner purchased no machinery and equipment in 1958. In 1959 and 1960 petitioner purchased machinery and equipment in the respective amounts of $24,831.65 and $112,908.16. Pro-forma profit and loss statements for the years 1954 through 1957 as prepared from petitioner's books and records are as follows: 1954
OPERATING INCOME: Construction, net of allowances
$307,233.17
Equipment rental
154,545.88
TOTAL OPERATING INCOME
$461,779.05
OPERATING EXPENSES: Beginning inventory, materials and supplies
$ 5,625.34
Purchases
153,943.80
$159,569.14
Ending inventory
1,725.50
Materials and supplies used
$157,843.64
Wages
40,228.44
Repairs and maintenance -
Machinery and equipment
14,300.47
Automobiles and trucks
2,993.90
Depreciation -
Machinery and equipment
59,328.35
Automobiles and trucks
16,143.50
Building and equipment rental
44,601.34
Other
34,515.61
TOTAL OPERATING EXPENSES
369,955.25
GROSS OPERATING PROFIT
$ 91,823.80
GENERAL AND ADMINISTRATIVE EXPENSES
76,609.93
NET OPERATING INCOME
$ 15,213.87
OTHER INCOME
38,804.37
NET EARNINGS BEFORE FEDERAL AND STATE INCOME
TAXES
$ 54,018.24
1955
OPERATING INCOME: Construction, net of allowances
$196,843.13
Equipment rental
134,323.59
TOTAL OPERATING INCOME
$331,166.72
OPERATING EXPENSES: Beginning inventory, materials and supplies
$ 1,725.50
Purchases
90,082.55
$91,808.05
Ending inventory
1,500.00
Materials and supplies used
$ 90,308.05
Wages
41,219.61
Repairs and maintenance -
Machinery and equipment
10,220.29
Automobiles and trucks
3,149.52
Depreciation -
Machinery and equipment
30,468.12
Automobiles and trucks
11,795.13
Building and equipment rental
26,702.23
Other
29,438.24
TOTAL OPERATING EXPENSES
243,301.19
GROSS OPERATING PROFIT
$ 87,865.53
GENERAL AND ADMINISTRATIVE EXPENSES
65,774.68
NET OPERATING INCOME
$ 22,090.85
OTHER INCOME
6,085.11
NET EARNINGS BEFORE FEDERAL AND STATE INCOME
TAXES
$ 28,175.96
1956
OPERATING INCOME: Construction, net of allowances
$265,582.00
Equipment rental
3,509.96
TOTAL OPERATING INCOME
$269,091.96
OPERATING EXPENSES: Beginning inventory, materials and supplies
$ 1,500.00
Purchases
147,101.64
$148,601.64
Ending inventory
1,500.00
Materials and supplies used
$147,101.64
Wages
34,078.54
Repairs and maintenance -
Machinery and equipment
5,473.73
Automobiles and trucks
3,376.57
Depreciation -
Machinery and equipment
9,564.93
Automobiles and trucks
9,228.42
Equipment rental
7,420.00
Other
28,155.81
TOTAL OPERATING EXPENSES
244,399.64
GROSS OPERATING PROFIT
$ 24,692.32
GENERAL AND ADMINISTRATIVE EXPENSES
53,663.13
NET OPERATING INCOME
(28,970.81)
OTHER INCOME
5,914.13
NET EARNINGS BEFORE FEDERAL AND STATE INCOME
TAXES
(23,056.68)
1957
OPERATING INCOME: Construction, net of allowances [1]
$395,784.81
Equipment rental
5,962.48
TOTAL OPERATING INCOME
$401,747.29
OPERATING EXPENSES: Beginning inventory, materials and supplies
$ 1,500.00
Purchases
195,951.78
$197,451.78
Ending inventory
1,500.00
Materials and supplies used
$195,951.78
Wages and subcontract work
40,388.86
Repairs and maintenance -
Machinery and equipment
5,797.88
Automobiles and trucks
5,876.06
Depreciation -
Machinery and equipment
3,576.94
Automobiles and trucks
24,648.44
Equipment rental
944.10
Other
34,583.11
TOTAL OPERATING EXPENSES
311,767.17
GROSS OPERATING PROFIT
$ 89,980.12
GENERAL AND ADMINISTRATIVE EXPENSES
56,514.70
NET OPERATING INCOME
$ 33,465.42
OTHER INCOME
5,642.40
NET EARNINGS BEFORE FEDERAL AND STATE INCOME
TAXES
$ 39,107.82
*163 The foregoing net earnings for 1955 do not include the amount of $234,545.29, representing gain on the sale of machinery and equipment. Petitioner reported the following amounts of taxable income (after special deductions) for the years 1954 through 1957: 1954
$ 46,650.86
1955
262,797.01
1956
28,756.28
1957
44,213.27
The taxable income reported for 1954 includes the amount of $29,061.36, representing petitioner's purported share of joint venture income which respondent has conceded in this proceeding did not constitute income to petitioner. At the end of the years 1943 to 1953 the corporation's books showed the following amounts as assets, liabilities, capital and capital surplus, and earned surplus: Capital and
Earned Year
Assets
Liabilities
Capital Surplus
Surplus
1943
$101,566.65
$ 57,079.19
$ 28,000.00
$ 16,487.46
1944
105,756.00
9,105.64
77,491.67
19,158.69
1945
139,987.65
42,777.36
77,491.67 19,718.62
1946
154,984.33
55,511.82
77,491.67
21,980.84
1947
215,327.50
48,219.17
113,134.06
53,974.27
1948
254 ,514.34
57,406.82
113,134.06
83,973.46
1949
251,224.03
35,934.16
113,134.06
102,155.81
1950
279,707.81
33,541.8 2
113,134.06
133,031.93
1951
300,561.66
25,828.68
113,134.06
161,598.92
1952
402,873.31
109,370.77
113,134.06
180,368.48
1953
379,237.12
66,884.71
113,134.06
199,218.35
*164 The balance sheets of the corporation at the end of the years 1954 to 1960 are as follows: December 31, ASSETS:
1954
1955
1956
1957
Current -
Cash on hand and in banks
$ 45,419.49
$ 39,797.76
$ 19,869.03
$ 77,752.62
Accounts receivable - trade
36,504.41
15,525.83
19,092.10
32,754.22
Accounts receivable - other
1,965.00
22,900.00
24,800.00
1,700.00
Inventories of materials and supplies
1,725.50
1,500.00
1,500.00
1,500.00
Certified checks on bids
460.00
300.00
7,044.14
Federal corporation income tax credit
Prepaid automobile and truck licenses
722.48
300.00
632.30
898.08
Prepaid insurance
4,873.89
1,682.57
1,258.29
2,494.35
Prepaid taxes
6,174.38
Advances to officer
2,604.14
2,604.14
2,604.14
2,604.14
Total current assets
$ 94,274.91
$ 84,610.30
$ 82,974.38
$119,703.41
Investments -
Stocks at cost
$258,135.31
$210,761.30
Less - adjustment to market value
42,386.30
Stocks at market value
$258,135.31
$168,375.00
Fixed -
Land
$ 12,139.00
$ 12,139.00
$ 12,139.00
$ 12,139.00
Buildings
45,319.31
45,319.31
45,319.31
51,469.93
Machinery and equipment
297,608.17
96,301.60
33,966.60
44,691.21
Furniture and fixtures
17,821.44
13,175.65
13,175.65
15,775.32
Automotive equipment
108,983.14
55,167.51
71,567.51
107,663.87
Driveway
6,000.00
6,000.00
6,000.00
6,000.00
Total fixed assets
$487,871.06
$228,103.07
$182,168.07
$237,739.33
Less - depreciation taken to date
304,781.88
111,380.56
108,493.14
133,741.55
Net fixed assets
$183,089.18
$116,722.51
$ 73,674.93
$103,997.78
Other -
Joint venture - Tobyhanna, Pennsylvania,
contract
$112,336.19
$ 74,682.72
$ 49,682.72
$104,304.46
Note receivable - officer
275,000.00
Advance to individual
1,008.32
Total other assets
$112,336.19
$ 74,682.72
$324,682.72
$105,312.78
TOTAL ASSETS
$389,700.28
$534,150.84
$481,332.03
$497,388.97
LIABILITIES: Current -
Accounts payable
$ 37,165.99
$ 1,188.31
Notes payable - bank
Advances from officer
Accrued payroll
$ 262.86
$ 212.10
Accrued taxes
25,121.88
83,023.60
9,401.47
17,421.69
Total liabilities
$ 62,287.87
$ 84,211.91
$ 9,664.33
$ 17,633.79
STOCKHOLDERS' EQUITY: Contributed capital
Capital stock - authorized 1,500 shares $20 par value per share issued and
outstanding 1,400 shares
$ 28,000.00
$ 28,000.00
$ 28,000.00
$ 28,000.00
Retained earnings free and unappro-
priated
229,412.41
421,938.93
443,667.70
451,755.18
Capital surplus
70,000.00
TOTAL LIABILITIES AND STOCK-
HOLDERS' EQUITY
$389,700.28
$534,150.84
$481,332.03
$497,388.97
*165 December 31, ASSETS:
1958
1959
1960
Current -
Cash on hand and in banks
$ 47,927.36
$ 23,305.04
$ 81,698.54
Accounts receivable - trade
29,280.59
19,048.61
37,286.58
Accounts receivable - other
16,499.54
Inventory of materials and supplies
2,000.00
35,192.12
800.00
Certified checks on bids
25.00
1,500.00
952.00
Prepaid automobile and truck licenses
1,007.55
993.00
1,010.49
Prepaid insurance
1,693.56
3,995.77
4,103.63
Prepaid taxes
1,718.05
3,680.24
2,452.35
Total current assets
$ 83,652.11
$ 87,714.78
$144,803.13
Investments -
Stocks at cost
$ 13,045.95
$ 28,127.21
U.S. Treasury bonds, 2 1/2%, 1968 - 63 at cost
$181,364.73
90,682.36
$181,364.73
$103,728.31
$ 28,127.21
Less - adjustment to market value
4,964.73
7,924.15
Investments at market value
$176,400.00
$ 95,804.16
$ 28,127.21
Fixed -
Land
$ 14,284.00
$ 14,284.00
$ 14,284.00
Building and signs
137,441.84
172,394.63
172,394.63
Machinery and equipment
44,691.21
38,700.65
124,103.61
Furniture and fixtures
15,924.80
58,310.44
14,952.58
Automotive equipment
93,202.16
99,704.33
117,174.90
Driveway
6,000.00
6,000.00
6,000.00
Total fixed assets
$311,544.01
$389,394.05
$448,909.72
Less - depreciation taken to date
152,666.13
168,820.54
204,586.17
Net fixed assets
$158,877.88
$220,573.51
$244,323.55
Other -
Joint venture - Tobyhanna, Pennsylvania, con-
tract
$104,304.46
$102,605.11
$102,605.11
Advance to officer
2,604.14
2,604.14
2,604.14
Advance to individual
1,013.36
1,013.36
Total other assets
$107,921.96
$106,222.61
$105,209.25
TOTAL ASSETS
$526,851.95
$510,315.06
$522,463.14
LIABILITIES: Current -
Accrued Federal taxes
$ 1,756.52
$ 1,756.04
STOCKHOLDERS' EQUITY: Contributed capital
Capital stock - authorized 1,500 shares $20.00
par value per share, issued and outstand-
ing 1,400 shares
$ 28,000.00
$ 28,000.00
$ 28,000.00
Retained earnings free and unappropriated
497,095.43
482,315.06
492,707.10
Total stockholders' equity
$525,095.43
$510,315.06
$520,707.10
TOTAL LIABILITIES AND STOCKHOLDERS'
EQUITY
$526,851.95
$510,315.06
$522,463.14
*166 The amounts representing earned surplus in the above balance sheets for the years 1954 to 1960 include the amount of $29,061.36, which respondent has conceded did not represent income to petitioner. Also, the amounts representing earned surplus for the years 1957 to 1960 include the amount of $54,621.74 which respondent has conceded was not income to petitioner. The maximum loans outstanding to petitioner from the Lancaster County National Bank during the years 1944 to 1954 were as follows: 1944
$ 30,000
1945
15,000
1946
50,000
1947
75,000
1948
100,000
1949
115,000
1950
110,000
1951
150,000
1952
100,000
1953
35,000
1954
15,000
The balance due the bank was paid off at the end of 1954. Petitioner declared no dividends for the years 1949 to 1957, inclusive. The Commissioner sent by registered mail to petitioner a letter dated December 2, 1958, notifying it of the proposed determination of liability for tax on accumulated earnings under section 531 for the years 1954 and 1955. The Commissioner sent by registered mail to petitioner a letter dated April 17, 1959, notifying it of the proposed determination of liability for tax on accumulated *167 earnings under section 531 for the years 1956 and 1957. Within 30 days after the mailing of the respective notifications referred to in the preceding paragraph, petitioner filed written protests setting forth statements of the grounds and facts on which it relies to establish that its earnings and profits have not been permitted to accumulate beyond the reasonable needs of its business. Petitioner's earnings and profits for the years 1954 and 1955 were not permitted to accumulate beyond the reasonable needs of the business. Petitioner was not availed of during the years 1954 and 1955 for the purpose of avoiding income tax with respect to its shareholder by permitting earnings and profits to accumulate instead of being divided or distributed. Petitioner's earnings and profits for the years 1956 and 1957 were permitted to accumulate beyond the reasonable needs of the business. Petitioner was availed of during the years 1956 and 1957 for the purpose of avoiding income tax with respect to its shareholder by permitting earnings and profits to accumulate instead of being divided or distributed. Issue 3. Travel and Entertainment Expenses On its 1956 return petitioner claimed deductions *168 of $12,796.73 for travel and entertainment expenses and $1,136.13 for dues and subscriptions, a total of $13,932.86, of which respondent disallowed as deductions $11,853.13 of the amount claimed for travel and entertainment and $838.78 of the amount claimed for dues and subscriptions. On its 1957 return, petitioner claimed deductions of $7,312.99 for travel and entertainment expenses, $798.69 for dues and subscriptions, and $6,600 for special meetings, a total of $14,711.68, of which respondent disallowed as deductions $10,481.71 for travel and entertainment and special meetings, and $432.79 for dues and subscriptions. It is not disputed that petitioner paid the full amounts claimed. Respondent allowed only such expenses as could be verified as to amount and business purpose by receipts and payments to transportation companies; and determined that the disallowed portions represented payments of personal expenditures of McMinn and added them to his income. On brief, respondent claims the disallowed amounts were constructive dividends to McMinn. Petitioner and McMinn argue that the entire amounts claimed are deductible by petitioner as ordinary and necessary business expenses and that *169 no part thereof is taxable to McMinn; and, in the alternative, if any part is taxable to McMinn it represents additional compensation to McMinn and is thus deductible by petitioner. During the years 1956 and 1957, McMinn, sometimes alone and sometimes with one or two employees or consultants of petitioner, took trips to various places to investigate business opportunities and sometimes place bids for petitioner; and they also made trips to New York City, Bogota, New Jersey, Philadelphia, Pennsylvania, and other cities in Pennsylvania in connection with petitioner's business, particularly in efforts to collect the balance due the joint venture on the Tobyhanna contract. The usual procedure was for petitioner to draw a check to cash $500for which was cashed by McMinn and used to defray the expenses of such trips. McMinn did not keep any records of his expenditures and did not account to petitioner for his expenditures. If he had money left over he kept it and purportedly used it for the next trip. When he ran out of money he had petitioner draw another check to cash which he cashed. Thirteen such checks for $500 each, totaling $6,500 were drawn to cash by petitioner in 1956 and were *170 charged to its travel and entertainment account; 9 such checks for $500 each, 3 checks for $300 each, 1 check for $1,500, and 1 check for $1,000, totaling $7,900, were drawn to cash (McMinn in one instance) by petitioner in 1957 and charged to travel and entertainment expense. At times the expenses of McMinn and the others for transportation and hotel bills were charged directly to petitioner and paid by it. In 1956, petitioner paid $163.65 for storm jackets which it presented to a boys' home operated by the Rotary Club of Lancaster, from which it derived favorable publicity. It also spent $236.13 for pens and beverage sets given to some of its customers as Christmas presents. Petitioner paid $439 in 1956 and $432.79 in 1957 as dues to a country club and a men's town club in Lancaster and deducted those amounts as business expense, which respondent disallowed. The clubs were used for both personal and business purposes by McMinn and his family. In 1957 McMinn went to Mayo Clinic in Rochester, Minnesota, for an operation. Due to unexpected complications it was necessary for him to stay there longer than anticipated. McMinn rented a hotel room in Rochester for 53 days in which *171 to keep in touch with petitioner's business by telephone and mail. Petitioner paid the room rent, totaling $636, while McMinn personally paid the hospital and doctors' bills and other charges incurred at the hotel. McMinn devoted 75 percent of his time in 1956 and 100 percent of his time in 1957 to the business of petitioner. He received a salary of $20,000 each year from petitioner and his salary was the only officer's salary paid by the corporation in those years. Petitioner paid $4,150 for travel and lodging expense, advertising, and club dues related to its business in 1956 and $2,586 for travel and lodging expense and club dues related to its business in 1957. Opinion Issue 1. Payments by Petitioner to McMinn in 1954 and 1955 The first issue is whether payments of $15,134.06 and $70,000 made by petitioner to McMinn in 1954 and 1955, respectively, were taxable income to McMinn. Respondent determined that the payments constituted taxable dividends to McMinn. McMinn contends that the payments were repayments of loans made by him to petitioner prior to 1954 and were nontaxable. A dividend is defined in section 316(a) and its predecessor sections basically as any distribution *172 of property made by a corporation to its shareholders out of earnings and profits accumulated after February 28, 1913, or out of its earnings and profits of the taxable year, and, except as otherwise provided in sections not applicable here, every distribution is made out of earnings and profits to the extent thereof. That portion of a distribution which is a dividend is includible in gross income under section 301. Petitioner's earnings and profits having exceeded the cash payments to McMinn at the time they were made, the amounts thereof are taxable to McMinn as dividends unless he can prove that they were repayments of loans. Arlington Park Jockey Club v. Sauber, 262 F. 2d 902 (C.A. 7, 1959); Gooding Amusement Co., 23 T.C. 408 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956), certiorari denied 352 U.S. 1031 (1957); Leland v. Commissioner, 50 F. 2d 523 (C.A. 1, 1931), affirming sub nom. Albert J. Gifford, 18 B.T.A. 795 (1930), certiorari denied 284 U.S. 656 (1931). It is undisputed that McMinn advanced or left with the corporation $85,134.06 which he had not been repaid prior to 1954. But respondent *173 determined that the advances represented contributions of capital rather than loans which could be recognized as such for tax purposes. Whether advances by a stockholder to a closely held corporation constitute investment of equity capital or loans is a question of fact. Gilbert v. Commissioner, 262 F. 2d 512 (C.A. 2, 1959), affirming a Memorandum Opinion of this Court, certiorari denied 359 U.S. 1002 (1959); American-La France-Foamite Corporation v. Commissioner, 284 F. 2d 723 (C.A. 2, 1960), affirming a Memorandum Opinion of this Court, certiorari denied 365 U.S. 881 (1961). And although the courts have suggested various criteria, such as the ratio of debt to equity capital, the book entries, whether outsiders would have made similar advances without security, the efforts to enforce the obligations, etc., see Gilbert v. Commissioner, supra, each case must be decided on its own facts. The intent of the parties has been said to be a major factor in determining the true nature of the relationship, Jennings v. United States, 272 F. 2d 842 (C.A. 7, 1959), but intent may often be a nebulous and illusory factor, *174 particularly where, as here, the parties are a corporation and its sole stockholder. Under such circumstances, while the self-serving declarations of the stockholder may be taken into consideration, it seems the essential question becomes whether the advances, as a matter of economic reality, have been put at the risk of the corporate business and thus constitute an equity investment on the stockholder's part, or whether they were advanced with the genuine and reasonable expectation that they would be repaid in all events regardless of the earnings and profits of the corporation and were thus a valid indebtedness running from the corporation to its stockholder. The only evidence supporting McMinn's contention here is the fact that the advances seem to have been treated as loans by the parties when originally made and McMinn's testimony that when he had the amount shown as owing to him in the loans payable account transferred to paid-in or capital surplus, he only intended to subordinate his loans to those of outside creditors and did not intend to make a contribution to capital; and that he did not intend the repayments to him to be dividends. While we are somewhat doubtful that *175 this alone would support his contention under the circumstances here involved, the remainder of the evidence seems to belie McMinn's testimony. While the record is not clear why the sum of $49,491.67 was transferred from the loans payable account to capital surplus by entries made as of December 31, 1944, it is clear that the $35,642.39 transferred from the former account to the latter account as of December 31, 1946, was for the express purpose of permitting petitioner to obtain loans for the operation of its business and that in making the transfer McMinn not only subordinated his advances to all other creditors, thus placing them at the risk of the business, but petitioner also held out to the world by its financial statements that no debtor-creditor relationship existed between the corporation and McMinn. McMinn specifically told petitioner's attorney that he had canceled petitioner's obligation to him by donating the amount thereof to surplus of petitioner - and this fact was recorded in the corporate minute book and reflected in its financial statements. Compare Commissioner v. Callner, 287 F. 2d 642 (C.A. 7, 1961), affirming a Memorandum Opinion of this Court, *176 relied on by McMinn. The fact that he recognized in 1946 that petitioner owed him only about $35,000 rather than about $85,000 supports the conclusion that he had previously forgiven or canceled, or had contributed to capital, the additional $49,491.67 standing in the loan account prior to December 31, 1944. There is no record evidence that the transfers were anything other than what they purported to be - contributions to capital surplus. No notes or other evidence of indebtedness were issued to McMinn, no interest was paid, no efforts were made by McMinn to enforce the obligations, the financial statements did not reflect loans payable to McMinn, there is no evidence of any agreement, written or oral, nor of the acknowledgment by the corporation of any obligation, to repay McMinn. In fact, the check stubs reflecting the payments to McMinn in 1954 and 1955 bore the notations "Reduce Surplus Capital" and "Return of Advance Capital Surplus." Based on the facts here present we are of the opinion that no true debtor-creditor relationship existed between petitioner and McMinn with respect to the $85,134.06 shown on petitioner's books as capital surplus at the time the payments were *177 made to McMinn in 1954 and 1955, that the advances made by McMinn in that amount represented, as a matter of substantial reality, investments of equity capital put at the risk of petitioner's business, and that the payments of $15,134.06 and $70,000 to McMinn in 1954 and 1955, respectively, did not constitute repayments of loans but were essentially equivalent to dividends and taxable to McMinn as such. The cases relied upon by petitioner are all distinguishable on their facts. An interesting contrast of facts, which we believe lends support to our conclusion here, is reflected in a comparison of the facts here with those discussed by Judge McAllister in his dissenting opinion in Gooding Amusement Co. v. Commissioner, 236 F. 2d 159 (C.A. 6, 1956), affirming 23 T.C. 408 (1954). Issue 2. Accumulated Earnings Tax under Section 531 Section 532 provides that the accumulated earnings tax imposed by section 531 shall apply to every corporation (with certain exceptions not material here) formed or availed of for the purpose of avoiding income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. *178 The fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business is made determinative of the proscribed purpose by section 533, unless the corporation proves to the contrary by a preponderance of the evidence. [3] Section 534 provides that in any proceeding involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall be on respondent if the notification provided for in subsection (b) has not been sent; and if the notification has been sent and the taxpayer has submitted a statement setting forth the grounds on which it relies to establish that the earnings have not been accumulated beyond the reasonable needs of the business, the burden of proof shall also be on respondent with respect to the grounds set forth in such statement. *179 In this proceeding the notice of deficiency did not specifically allege an accumulation beyond the reasonable needs of the business but determined that petitioner was subject to the accumulated earnings tax for the years 1954, 1955, 1956, and 1957 for the reason that it had been availed of for the purpose of avoiding surtax with respect to its shareholders by accumulating rather than distributing earnings. Nevertheless, respondent sent the notice provided for in section 534(b) and petitioner filed the statement provided for in section 534(c). This might pose a question as to which party had the burden of proof on whether the accumulations were beyond the reasonable needs of the business, see Pelton Steel Casting Co., 28 T.C. 153, 180-185 (1957), affd. 251 F. 2d 278 (C.A. 7, 1958), certiorari denied 356 U.S. 958 (1958), but neither party relies on the burden of proof on this point and we see no reason to interject this problem here where the evidentiary facts are in the record and it is simply a question of ultimate fact whether the earnings and profits were permitted to accumulate beyond the reasonable needs of the business. We think it is *180 clear on the record in this case that the question whether petitioner was availed of for the purpose proscribed by section 531 depends on whether the accumulations exceeded the reasonable needs of the business and that the ultimate issue will turn on that point. Cf. Breitfeller Sales, Inc., 28 T.C. 1164 (1957). Both parties brief the issue on that basis, although respondent does save the argument that accumulations for the reasonable needs of the business at a later date are not necessarily incompatible with accumulations to avoid surtax on shareholders, which he claims petitioner must disprove. In deciding accumulated earnings tax cases, the courts have given consideration to numerous factors, such as corporate loans to shareholders, Kerr-Cochran, Inc. v. Commissioner, 253 F. 2d 121 (C.A. 8, 1958), affirming a Memorandum Opinion of this Court; investments in marketable securities of unrelated corporations, Helvering v. Nat. Grocery Co., 304 U.S. 282 (1938); Wellman Operating Corporation, 33 T.C. 162 (1959); income tax savings to the shareholders, Latchis Theatres of Keene, Inc., 19 T.C. 1054 (1953), affd. 214 F. 2d 834 *181 (C.A. 1, 1954); Kerr-Cochran, Inc., 30 T.C. 69 (1958); the ratio of current assets to current liabilities, I. A. Dress Co., 32 T.C. 93 (1959), affd. 273 F. 2d 543 (C.A. 2, 1960), certiorari denied 362 U.S. 976 (1960); the dividend history of the corporation, Dixie, Inc., 31 T.C. 415 (1958), affd. 277 F. 2d 526 (C.A. 2, 1960), certiorari denied 364 U.S. 827 (1960); and that a closely held corporation invites close scrutiny, World Pub. Co. v. United States, 169 F. 2d 186 (C.A. 10, 1948). Varying weights have been given these factors under the circumstances of each case. None of them is conclusive nor is any combination of them necessarily conclusive. The reasonable needs of any particular vital business cannot be measured by inanimate devices any more than can "purpose," which is a subjective matter, be determined by reference to such devices. However, such factors or indicators are helpful and we have given them consideration in determining whether the accumulations of the particular business concern here involved were beyond the reasonable needs of that business in the particular *182 years here involved. We do not think we could any more justly determine this essentially factual question by looking at petitioner's books and records alone, and ignoring the testimony of its principal officer and stockholder, than we could by listening only to the arguments of that officer and stockholder and paying no attention to the balance sheet and profit and loss figures. We have tried to afford the proper weight to both in reaching our conclusion here. Prior to 1954 petitioner was apparently seriously engaged in the large-contract road construction business which, because of bonds that have to be furnished, delays in payments, disputes over change orders, and cost of heavy equipment used, among other things, requires considerable capital. Were we convinced that petitioner seriously and reasonably expected to continue to participate in that business throughout the years here involved, we would not consider its accumulation of earnings and profits unreasonable for that business, particularly in view of the fact that a large part of the accumulation represents profit on the sale of its heavy equipment in 1955, which it undoubtedly would have had to replace at a heavy cost had *183 it subsequently been successful in obtaining large road construction contracts. The evidence indicates that the last of these contracts performed by petitioner was concluded sometime in 1954 or 1955. We think it is reasonable to accept McMinn's testimony that the company intended to obtain, and had a reasonable expectation of obtaining, additional large construction contracts through the year 1955. True, it sold most of its heavy equipment in 1955, but it kept the proceeds in liquid assets and we accept McMinn's testimony that it seemed wiser to sell the old equipment, which was deteriorating while not in use, and buy new equipment if a contract was obtained. Without prolonging this Opinion with discussions which would be of little value in any other case, we simply state that we have considered all the arguments of both parties and the evidence before us and have concluded therefrom that petitioner's accumulation of earnings and profits as of the end of the years 1954 and 1955 did not exceed the amount that a prudent businessman would consider appropriate for the then present and reasonably anticipated future business needs of petitioner, see section 1.537-1(a), Income Tax Regs. *184 , and that the retention of its earnings and profits, if any, for those years did not result in an accumulation beyond the reasonable needs of the business. Finding, as we do, that petitioner retained its earnings and profits for the years 1954 and 1955 for the reasonable or reasonably anticipated needs of its business, we think this overcomes any presumption of correctness that attaches to respondent's determination that petitioner's earnings for those years were accumulated rather than distributed for the purpose of avoiding surtax on its shareholders, and that the purpose for retaining its earnings for the years 1954 and 1955 was not the purpose proscribed by section 532. Hence, the accumulated earnings tax imposed by section 531 is not applicable to petitioner for 1954 and 1955. However, we conclude differently with respect to the years 1956 and 1957. Petitioner had no large road construction contracts in those years and we think it had become reasonably apparent at least by the end of 1956 that petitioner was not going to obtain any such contracts unless it submitted more competitive or risky bids, which McMinn testified he was not willing to do. We think this conclusion finds *185 support not only in the activities, or lack thereof, of petitioner in this field in 1956 and 1957, but also in the activities of petitioner in the years subsequent to 1957, evidence of which was submitted by petitioner. While there is evidence that McMinn did investigate several sizeable construction projects in behalf of petitioner in the years 1956 and 1957, there is no convincing evidence that any bids on large contracts were even submitted by petitioner during those years. The evidence also indicates that petitioner did not receive a contract on what might be considered a large job until 1959 and that contract amounted to only a little over $100,000; whereas petitioner had bid and performed contracts involving in excess of $1 million in years prior to 1955 with considerably less capital and surplus than the approximately $470,000 petitioner had at the end of 1956. We do not believe petitioner could have reasonably anticipated active participation in large construction contracts during or at the end of either of the years 1956 and 1957. Nor do we think any other business needs of petitioner required an accumulation of additional earnings and profits during the years 1956 and 1957. *186 Petitioner had practically no liabilities except for taxes at the end of 1956 and 1957, while it had cash, receivables, and liquid investments alone of at least $300,000 at both of those times. McMinn testified that it would cost about $300,000 to replace two asphalt mix plants petitioner used in that business. We recognize that a reasonable reserve for replacement of depreciable plant and equipment, possibly even in excess of a cost depreciation reserve where prices have increased, may be a reasonable business need. But there is no evidence here to indicate that these two plants would have to be replaced anytime soon (they were still in use at the time of this trial) or that the available funds would not take care of this need. McMinn also testified that petitioner owned two old buildings that could be put to good use if money was spent to renovate them. Petitioner did renovate one of these buildings in 1958 without seriously impairing its capital structure and there was no evidence of any immediate plans for renovating the second building. The fact that petitioner at times had accounts receivable from its asphalt and oil business of up to $100,000 does not convince us that it needed *187 additional surplus. The average accounts receivable it carried appear to have been considerably less than this amount. Furthermore, petitioner was in a position to loan McMinn sizeable sums of money in 1956 without interest, the balance due being $275,000 at the end of 1956. The principal thrust of petitioner's argument is that it needed additional surplus to engage in the contract construction business on a large scale. Absent this requirement, which we do not think was present in 1956 and 1957, neither petitioner's argument nor the evidence convinces us that petitioner had a reasonable business need to retain its earnings and profits for those years. Where there is evidence that an independent board of directors of a corporation has given serious consideration to the actual needs of the business based on the directors' experience in the business and on known or reasonably predictable factors, we would be hesitant to substitute our judgment of the reasonable needs of the business for that of the directors. But where, as here, the one person who obviously determined the policy and made the decisions for the company is the sole stockholder of the company, we are not constrained *188 to give as much weight to his decision on this point unless it is supported by more tangible evidence than is presented here. See Pelton Steel Casting Co., supra, at 173-174. The extrinsic evidence here does not support McMinn's testimony with respect to the reasonable needs of the business in 1956 and 1957. We conclude that the accumulation of earnings and profits for the years 1956 and 1957 was beyond the reasonable needs of the business. We realize that the accumulated earnings credit, computed after giving effect to this Opinion, may offset in part or all the corrected accumulated taxable income in these years. We also recognize that petitioner's books showed a net operating loss of $23,056.68 for 1956. We have given consideration to these factors in reaching our conclusion but they do not change our opinion that the retention of any earnings and profits for the years 1956 and 1957 was not necessary for the business. To hold otherwise might permit a corporation to avoid the surtax by claiming deductions to which it was not entitled. Under section 533, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs *189 of the business is made determinative of the purpose to avoid income tax with respect to shareholders, unless the corporation by preponderance of the evidence shall prove to the contrary. No such proof is present here, and consequently we hold that petitioner is liable for the accumulated earnings tax on all of its accumulated taxable income for the years 1956 and 1957 as determined under section 535 as applicable to those years. Issue 3. Travel and Entertainment Expenses Respondent disallowed $12,691.91 of the $13,932.86 claimed by petitioner as deductions for travel and entertainment expenses and dues and subscriptions on its 1956 return; and $10,914.50 of the $14,711.68 claimed by petitioner as deductions for travel and entertainment, special meetings, and dues and subscriptions on its 1957 return; and had added the disallowed amounts to McMinn's income as constructive dividends covering expenditures of a personal nature to McMinn. The evidence indicates that the amounts disallowed represent the difference between the amounts paid by the corporation and claimed on its returns and the amounts which respondent could verify from receipts and other records as spent for business *190 purposes of petitioner. Respondent's determinations on this issue are presumed to be correct and the burden of proving that it is entitled to deduct any amount in excess of the amounts allowed rests on petitioner. Petitioner's evidence on this issue does not provide many of the details of the claimed expenditures. Nevertheless, we are convinced from the evidence presented, including the testimony of George Atkins, Jr., an employee and consultant of petitioner, as well as the testimony of McMinn, that McMinn and others did take trips looking for business and submitting bids for petitioner during the years 1956 and 1957 which were sufficiently related to the business of petitioner that the cost thereof would be deductible as a business expense by petitioner if properly established; and that partially in reliance on the principle established in Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930), and partially on the evidence presented to us, petitioner is entitled to deduct the sum of $4,150 in 1956 and the sum of $2,586 in 1957 for travel and miscellaneous expenses in addition to the amounts allowed by respondent. Without taking the space to set out the details of our *191 computations, but with the explanation that they are based on all the evidence presented judged most heavily against petitioner upon whom the burden of proof rests, the amounts have been arrived at as follows. It is pretty clear from the evidence that during the early part of 1956 McMinn took two trips to Nassau, each for a period of about 10 days and on the second of which he was accompanied by two employees of petitioner, investigating a possible airport job for petitioner. A conservative estimate of the cost of transportation, lodgings, and food on these trips that was attributable to petitioner's business is $1,900. McMinn also took a trip to Miami in 1956 to investigate an airport job for petitioner where he stayed "several weeks"; we have estimated the business cost of this trip at $530. While it is not too clear whether the trip was in late 1955 or early 1956, the evidence indicates McMinn and Atkin went to Macon, Georgia, to investigate a job for petitioner where they stayed about 1 week. We have allowed a cost of $500 for this trip in 1956. The evidence indicates that McMinn, Atkin, and at times McGarry, took trips to New York City, Bogota, New Jersey, Chicago, and Philadelphia, *192 and other cities in Pennsylvania, on various occasions during 1956 on petitioner's business. The transportation costs on some of these trips were apparently included in the amounts allowed by respondent, but in the absence of any evidence on which trips were included we have allowed nothing for transportation costs on these trips. We have estimated the cost of food and lodgings on these trips to be $600 in 1956. We believe the evidence supports the conclusion that the storm jackets and pens and beverage sets purchased by petitioner in 1956 were sufficiently related to petitioner's business to be allowable as business expense and we have included the cost thereof, totaling approximately $400, in the deduction allowed for 1956. And finally we have concluded that approximately one-half of the club dues paid by petitioner in 1956, or $220, is deductible as a business expense. In early 1957 McMinn took one trip alone for about 1 week, and another trip accompanied by Atkin for 10 days to 2 weeks, to Puerto Rico to investigate the possibilities of establishing petitioner in the asphalt-paving business there. We have estimated the business cost of these trips to be $1,135. McMinn, Atkin, *193 and McGarry also took miscellaneous trips to the various eastern cities mentioned above in 1957 and we have estimated the deductible costs of these trips to be $600, as in 1956. We have again allowed about one-half of the club dues paid by petitioner in 1957, or $215. While there might be some question whether the cost of the hotel room in Rochester while McMinn was at the Mayo Clinic in 1957 was a necessary expense of petitioner's business, the amount thereof is not in dispute and the only evidence we have is McMinn's testimony that he used the room to keep in touch with petitioner's affairs. Inasmuch as McMinn was the president and sole salaried officer of petitioner, and the amount claimed does not include any of McMinn's medical expense, we have allowed the $636 room rent paid by petitioner as a business expense. We have not allowed any amount specifically for entertainment. There is no evidence on which we could make such an allowance. The final question is whether the remainder of the amounts disallowed for travel, entertainment, dues, and subscriptions in the amounts of $8,541.91 in 1956 and $8,328.50 in 1957 are otherwise deductible by petitioner as additional compensation *194 and are includible in McMinn's income as either constructive dividends or additional compensation. It is impossible to determine from the record what the disallowed expenditures represent. It seems clear that these amounts consist in part of the cash checks drawn by McMinn at fairly regular intervals and in fairly regular amounts throughout both years. We have no analysis of petitioner's travel and entertainment account and cannot tell what the rest of the charges to it were. Respondent has determined that these amounts were nondeductible by petitioner and taxable to McMinn, and his determinations are presumptively correct. On the other hand, McMinn testified that all amounts paid to him or on his behalf by petitioner were spent by him in connection with petitioner's business - and we have no evidence to the contrary except petitioner's failure to prove what all of it was spent for. It would appear from the regularity of the cash checks that they were drawn without much direct connection with specific business trips. We do not think we could say from the evidence presented that any payments to or on behalf of McMinn were specifically intended to be either additional compensation *195 or dividends to him - there is no indication that any thought was given to the question one way or the other. On this state of the record, and in view of the fact that it was petitioner's responsibility to keep records and account for these expenditures which both petitioner and McMinn have failed to do, we can only conclude that petitioner has failed to overcome the presumptive correctness of respondent's determination that the payments were nondeductible by petitioner and taxable as income to McMinn. We accordingly find that the amounts of the payments disallowed under this Opinion were constructive dividends to McMinn. The amount of these constructive dividends should be taken into consideration in computing the dividends paid credit under the accumulated earnings tax issue. Decisions will be entered under Rule 50. Footnotes
1. All section references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. It is not entirely clear whether the entries as of December 31, 1944, were made in 1944 or whether all of the entries were made as closing entries for 1946.↩
1. For years 1957 and later, termed "sales".↩
3. SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxtable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of - (1) 27 1/2 percent of the accumulated taxable income not in excess of $100,000 plus (2) 38 1/2 percent of the accumulated taxable income in excess of $100,000. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule. - The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed. * * *
SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable Accumulation Determinative of Purpose. - For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.↩